654 F.2d 218
 1981-1 Trade Cases 64,154
 William OWENS and Jean Owens, Appellants,
v.
AETNA LIFE & CASUALTY CO., a Connecticut Corporation, and
its subsidiary, Aetna Casualty and Surety Co., a Corporation
of Connecticut, Durward M. Stayton, Jr., and Donald Millure,
The Medical Society of New Jersey, a New Jersey Corporation,
Chubb & Son, Inc., a New York Corporation, Federal Insurance
Company, a New Jersey Corporation, Joseph A. Britton, Joseph
A. Matt, Joan B. Snyder, Kay B. Imtello, William A. Reilly
and William P. Muhl, each individually and trading as Joseph
A. Britton Agency.
Aetna Life & Casualty Co., a Connecticut Corporation, and
its subsidiary, Aetna Casualty and Surety Co., a
Corporation of Connecticut, Duward M.
Stayton, Jr. and Donald
Millure, Appellees.
 No. 80-1049.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 18, 1980.
Decided June 29, 1981.
As Amended July 7, 1981.
 
 Howard W. Kushner, Freehold, N.J., Robert Dwight Roadman (argued), Warrenton, Va., for appellants.
 Sidney S. Rosdeitcher (argued), Jack Hassid, Andrew Kull, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for appellees.
 Before GIBBONS, WEIS and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 William Owens and Jean Owens appeal from an order granting summary judgment in favor of Aetna Life & Casualty Co., Aetna Casualty & Surety Co., Durward M. Stayton and Donald Millure (collectively "the Aetna Defendants") on their eight count complaint against those defendants and others. Of the eight counts, two alleged violations of the federal antitrust laws, five alleged causes of action under New Jersey law, and one, on behalf of Jean Owens, is described as "derivative."[1] Although the notice of appeal is addressed to a judgment which dismissed all counts against the Aetna Defendants, the appellants seek review of it only insofar as it granted summary judgment on Counts 1 and 2 of the amended complaint. Appellant's Brief at 6. Addressing those counts, we affirm the grant of summary judgment.[2]
 
 I.
 
 2
 William Owens is an insurance broker licensed in the State of New Jersey. An insurance broker is "an individual who, for a commission or brokerage consideration, shall act or aid in any manner in negotiating contracts of insurance, or soliciting or effecting insurance as agent for an insured or prospective insured, other than himself; or an individual who, being a licensed agent (for an insurance company), places insurance in an insurance company which he does not represent as agent." N.J.S.A. 17:22-6.2. A broker acts for the insured for the purpose of making the application and procuring an insurance policy. Coro Brokerage, Inc. v. Rickard, 29 N.J. 295, 148 A.2d 817 (1959). Owens also alleges that he was, at the time relevant to this action, an agent of the Aetna Defendants. An insurance agent is "an individual ... authorized in writing by any insurance company lawfully authorized to transact business in (New Jersey), to act as its agent, with authority to solicit, negotiate and effect contracts of insurance in its behalf...." N.J.S.A. 17:22-6.1. Owens claims that he specialized in medical professional liability or malpractice insurance. Reading the allegations in his complaint, his affidavits, and the interrogatories, admissions and depositions on file in the light most favorable to him, it appears that his business was the placement, as a broker, of medical malpractice insurance on behalf of physicians, and the solicitation of such business on behalf of Aetna.
 
 
 3
 The Aetna Defendants include Aetna Casualty & Surety Co., an underwriter of liability insurance including medical malpractice coverage, and its parent, Aetna Life & Casualty Company. Stayton and Millure are, respectively, General Manager and Marketing Manager of Aetna's Haddonfield, New Jersey office. Other named defendants include the Medical Society of New Jersey, a professional organization of physicians, Federal Insurance Company and its parent, Chubb & Son, Inc. (Chubb), which also underwrite medical malpractice insurance, and six individuals engaged, like Owens, in the insurance brokerage business under the name Joseph A. Britton Agency (Britton Agency). The Medical Society of New Jersey is the owner of a group policy of medical malpractice insurance issued by Chubb. Britton Agency is the broker for the Medical Society of New Jersey. A fact finder could conclude that Britton Agency is in essentially the same business as Owens, acting as broker in placing medical malpractice insurance on behalf of the Medical Society of New Jersey and soliciting the Medical Society's business as agent on behalf of Chubb.[3]
 
 
 4
 The events giving rise to this suit began in 1974 when Aetna announced that it would no longer market medical malpractice insurance in New Jersey. Owens alleges Aetna's withdrawal from the New Jersey market had a serious financial impact on his insurance business since he lost his current source of insurance. Moreover, another source was not readily available since Britton Agency was the exclusive agent for Chubb/Federal, the major remaining company offering malpractice insurance in New Jersey.
 
 
 5
 The initial complaint was the subject of a motion for a more definite statement, which was granted in October 1975. An amended complaint alleges a number of state law claims including fraudulent inducement of the sale of Owens' business, libel, unlawful interference with his business relationships, and violation of unspecified portions of the New Jersey antitrust laws. The factual allegations in support of these state law claims are in many respects duplicative of those supporting Counts I and II, which this appeal addresses. Those counts charge a conspiracy among the defendants in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and a conspiracy to monopolize the business of medical malpractice insurance in violation of Section 2 of that Act, 15 U.S.C. § 2. The issue to be decided is whether, considering "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any" there is any "genuine issue as to any material fact," and whether "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Reading the allegations of the complaint generously, it charges (1) that the Aetna Defendants and Chubb conspired to divide the liability insurance market in New Jersey so that only Chubb would write medical malpractice insurance in New Jersey, and do so only on a group basis for the Medical Society of New Jersey, while Aetna would do so in other states, and would, without competition from Chubb, sponsor all group automobile and homeowners' insurance arranged by the Medical Society for its members; (2) that the Aetna Defendants and Chubb boycotted him; and (3) that the defendants conspired in other ways to drive Owens out of business. Those allegations must, however, be tested not in the abstract, but in light of an extensive record of depositions, interrogatories, admissions, and affidavits. Examining those, we must, after first determining all issues of disputed fact in Owens' favor, decide whether as a matter of law either section of the Sherman Act would provide grounds for relief. The district court concluded that neither would, because any activity Owens could hope to prove was exempt from antitrust scrutiny by virtue of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (1976), and because there was no evidence that the Aetna Defendants boycotted him or conspired to drive Owens out of business.
 
 II.
 
 6
 Before turning to the specific facts in the extensive record, a brief description of the regulatory scheme for liability insurers licensed to do business in New Jersey will help to place those facts in context. A key provision of that scheme is N.J.S.A. 17:29A-15, which prohibits any insurer, broker or agent from charging, demanding or receiving a premium for any policy of insurance except in accordance with a rating system on file with and approved by the New Jersey Insurance Commissioner. The statutory standard for the Commissioner's approval is a rate "not unreasonably high or inadequate for the safety and soundness of the insurer, and which (does) not unfairly discriminate between risks in this State involving the same hazards and expense elements...." N.J.S.A. 17:29A-4. While individual insurers may make their own rate filings with the Commissioner the statute also contemplates that filings will be made on behalf of insurers by licensed rating organizations, which are organizations "engaged in the business of rate-making for two or more insurers." N.J.S.A. 17:29A-1(f). Each rating organization must admit, without discrimination, any insurer engaged in issuing the kind of insurance for which that organization has been approved by the Commissioner for rate-making. N.J.S.A. 17:29A-3. Thus the New Jersey statutory scheme affirmatively encourages joint action in rate-making. Rate-making, moreover, includes the classification of risks, such that rates may vary somewhat according to the degree of risk. N.J.S.A. 17:29A-4(a). Thus both the rates and the classifications of risks may be the result of joint action among firms that would otherwise be competitors, subject to approval by the Commissioner.
 
 
 7
 Among the rates and classifications are those applicable to mass marketing of property and liability insurance through employer or association groups. Pursuant to general rule-making authority, N.J.S.A. 17:1-8.1 & 17:1C-6(e), the Commissioner has adopted comprehensive regulations for such mass marketing plans. N.J.A.C. 11:2-12.1 to 12.15. A mass marketing plan is one in which insurance "is offered to employees of particular employers or to members of particular associations or organizations" and for which "(s)ome rate, coverage, underwriting or substantial service advantage is provided which is not available from the same insurer on a nonplan basis." N.J.A.C. 11.2-12.2(2), (3). Premiums and policy forms for mass marketing plans must comply with the same filing and approval requirements as individual insurance, and are governed by the same standards for such approval. N.J.A.C. 11:2-12.5. In order for the Commissioner to discharge the responsibility for approving classifications and rates, the New Jersey law authorizes him to require disclosure of loss and expense experience in this state and elsewhere. N.J.S.A. 17:29A-5. Insurers selling mass marketing plans must maintain separate statistics for any plans providing some rate or coverage advantage not available from the same insurer on a nonplan basis. N.J.A.C. 11:2-12.6. No insurer may sell insurance pursuant to a mass marketing plan if a condition of membership in an organization through which it is offered is the purchase of insurance through the plan or if the member is subject to a penalty by reason of nonparticipation. N.J.A.C. 11:2-12.8.
 
 
 8
 Thus under New Jersey law there is (1) comprehensive state regulation of rates and classifications of risk; (2) state encouragement of and comprehensive regulation of rate-filings by rating organizations, which file rating-systems for many insurance companies; and (3) state recognition and regulation of differences in rates and coverages between insurance issued pursuant to mass marketing plans and that issued in the form of individual policies. Moreover, because the Commissioner may insist on disclosure of loss experience in other states, he can prevent discrimination in rates and classifications against insureds in this state.
 
 
 9
 In this case we are dealing with insurance "(a)gainst loss or damage resulting from accident to or injury suffered by any person for which loss or damage the insured is liable," N.J.S.A. 17:17-1(e), i. e., the generic category of liability insurance. That type of insurance covers not the occurrence of the casualty, but rather the indemnification for damages for legal liability and the cost of defending a lawsuit. As the caseload statistics of any court system in the United States attest, two of the major categories of risk of such liability are automobile accidents and medical malpractice. For purposes of state regulation these two kinds of coverage present similar problems. As outlined above, the state pursues the competing but equally important goals of assuring insurer solvency and preventing unfair discrimination by substituting state determination of rates and coverages for free competition among insurers. In such a regulatory climate where competition on the basis of rates and coverage is eliminated, but underwriting profits are still desired, competition will occur in the selection of risks, with companies seeking to capture the low-risk classifications of insurance and avoid the high-risk classifications, for which the rates charged may be higher, but not sufficiently high to attract insurers. In other words, for liability insurance the effort inevitably will be to select those insureds statistically less likely to incur liability. An automobile liability insurer which can succeed in confining its coverage to automobile owners over age 25, below age 60, with no driving age children in the family and with a breadwinner who commutes to work on public transportation, will be more likely to make an underwriting profit than will the company which insures teenage drivers, older drivers, and drivers who use their cars to commute to work every day. A company writing medical malpractice coverage which insures only pediatricians and internists is much more likely to make an underwriting profit than one which insures orthopedists and other surgeons. If competition is permitted in risk selection the socially undesirable consequences may be either that those most at risk cannot obtain insurance at all, or that the solvency of companies which wind up insuring them will be impaired. Either consequence violates the basic principle of insurance, that of risk spreading. The least expensive insurance for any category of insurance, overall, will always be that in which the pool of insureds includes the largest universe.
 
 
 10
 There are several methods by which a state can deal with the social consequences of adverse risk selection. It could eliminate rate-fixing, so that the less desirable risks always could get coverage by paying more money. In the case of high-risk medical specialties such as orthopedists and other surgeons, that would result in passing insurance costs on to patients, a not particularly attractive solution when one remembers that many patients are needy. It could devise an assigned-risk scheme which eliminated competition in risk selection.[4] Short of that step, it could approve a rating-system which tends to encourage maximization of the pool of risks by operation of the forces of the market. One method of doing so is permitting the sale of insurance pursuant to a mass marketing plan which provides a financial incentive for purchasing coverage through an association. The key to the success of such an approach is to fix a group rate low enough to encourage low-risk insureds to forego purchasing individual policies, but high enough, considering the number of group members, to produce an underwriting profit even when the high-risk insureds are covered. New Jersey's regulations governing mass marketing plans, of which the rating-system applicable to the New Jersey Medical Society policy is one, adopt this latter approach. The Commissioner has approved a rating-system for a group rate filed on behalf of a number of companies in connection with voluntary associations such as the Medical Society.
 
 
 11
 The necessary consequence of a group marketing plan is that the broker for an association, or the agent for an insurance company which successfully solicits that association's group policy on its behalf, forecloses other brokers or agents from selling individual policies to those association members who chose group coverage. Foreclosure occurs only to the extent that members elect group coverage, however, for under N.J.A.C. 11:2-12.8, association members remain free to obtain individual coverage if they prefer.
 
 III.
 
 12
 Also helpful for an appreciation of the record is an understanding of the relevant federal law, and its relationship to the New Jersey regulatory scheme. The McCarran-Ferguson Act provides in relevant part:
 
 
 13
 Sec. 2(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
 
 
 14
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.
 
 
 15
 Sec. 3.
 
 
 16
 (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.
 
 
 17
 59 Stat. 33-34, as amended, 61 Stat. 448 (codified at 15 U.S.C. §§ 1012-1013 (1976)). The Act was passed in response to the decision in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which overruled Paul v. Virginia, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869). The latter case had held that a policy of insurance is not a transaction of commerce, and for 75 years it was assumed that federal commerce clause legislation did not apply to the insurance industry. During that time state law had of necessity filled a federal regulatory vacuum. After the South-Eastern Underwriters decision, Congress anticipated that many of those state regulatory laws might be challenged on statutory supremacy or commerce clause grounds, so it enacted the quoted provisions, which in part defer to state regulation. The Act makes applicable to the business of insurance the Sherman and Clayton Acts "to the extent that such business is not regulated by state law." State regulation may not, however, shield conduct which amounts to boycott, coercion or intimidation. But before the deference to state regulation comes into operation, the conduct must be found to be the "business of insurance."
 
 
 18
 The McCarran-Ferguson Act contains no definition of the "business of insurance." The term appears in a statute creating a limited exemption to the antitrust laws, however, and thus falls within the compass of the general rule that even express exemptions from antitrust laws are narrowly construed.[5] Thus the Court has held that the exemption is not applicable to all activities of insurance companies, but only to those activities falling within the "ordinary understanding" of the statutory phrase. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979); SEC v. National Securities, Inc., 393 U.S. 453, 459-60, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969). The earmark of insurance is the underwriting and spreading of risks in exchange for a premium. SEC v. Variable Annuity Life Insurance Co., 359 U.S. 65, 73, 79 S.Ct. 618, 623, 3 L.Ed.2d 640 (1959). That activity encompasses, however, more than making contracts between an insurer and an insured. As the Supreme Court has demonstrated in its review of the relevant legislative history, backers of the McCarran-Ferguson Act were acutely aware of the data-gathering aspects of the insurance business.
 
 
 19
 Because of the widespread view that it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation, the primary concern of both representatives of the insurance industry and the Congress was that cooperative ratemaking efforts be exempt from the antitrust laws. The passage of the McCarran-Ferguson Act was preceded by the introduction in the Senate Committee of a report and a bill submitted by the National Association of Insurance Commissioners on November 16, 1944. The views of the NAIC are particularly significant, because the Act ultimately passed was based in large part on the NAIC bill. The report emphasized that the concern of the insurance commissioners was that smaller enterprises and insurers other than life insurance companies were unable to underwrite risks accurately, and it therefore concluded:
 
 
 20
 "For these and other reasons this subcommittee believes it would be a mistake to permit or require the unrestricted competition contemplated by the antitrust laws to apply to the insurance business. To prohibit combined efforts for statistical and rate-making purposes would be a backward step in the development of a progressive business. We do not regard it as necessary to labor this point any further because Congress itself recently recognized the necessity for concert of action in the collection of statistical data and rate making when it enacted the District of Columbia Fire Insurance Rating Act." Id., at A4405 (emphasis added).
 
 
 21
 The bill proposed by the NAIC enumerated seven specific practices to which the Sherman Act was not to apply. Each of the specific practices involved intra-industry cooperative or concerted activities.
 
 
 22
 The floor debates also focused simply on whether cooperative ratemaking should be exempt. Thus, Senator Ferguson, in explaining the purpose of the bill, stated:
 
 
 23
 "This bill would permit and I think it is fair to say that it is intended to permit rating bureaus, because in the last session we passed a bill for the District of Columbia allowing rating. What we saw as wrong was the fixing of rates without statutory authority in the States; but we believe that State rights should permit a State to say that it believes in a rating bureau. I think the insurance companies have convinced many members of the legislature that we cannot have open competition in fixing rates on insurance. If we do, we shall have chaos. There will be failures, and failures always follow losses." 91 Cong.Rec. 1481 (1945).
 
 
 24
 The consistent theme of the remarks of other Senators also indicated a primary concern that cooperative ratemaking would be protected from the antitrust laws. Id., at 1444 and 1485 (remarks of Sen. O'Mahoney); 485 (remarks of Sen. Taft). President Roosevelt, in signing the bill, also emphasized that the bill would allow cooperative rate regulation. He stated that "Congress did not intend to permit private rate fixing, which the Antitrust Act forbids, but was willing to permit actual regulation of rates by affirmative action of the States." S. Rosenman, The Public Papers and Addresses of Franklin D. Roosevelt, 1944-1945 Vol., p. 587 (1950).
 
 
 25
 Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. at 221-24, 99 S.Ct. at 1078-1079.
 
 
 26
 Even mindful of the rule of construction that exemptions to the antitrust laws must be narrowly construed, it is clear that at least the following activities are the business of insurance, either because they pertain to risk-spreading or to the contract between the insurer and the insured:
 
 
 27
 1. preparing and filing a rating-schedule, either on behalf of an individual company or jointly through a rating bureau;2. deciding upon rating classification differences between individual policies and group marketing plans, either individually or jointly through a rating bureau;
 
 
 28
 3. authorizing agents to solicit individual or group policies;[6]
 
 
 29
 4. accepting or rejecting coverages tendered by brokers.
 
 
 30
 Each of these activities is exempt from the antitrust laws by virtue of section 2(b) of the McCarran-Ferguson Act so long as these activities are regulated by state law and do not amount to boycott, coercion, or intimidation.
 
 
 31
 As we have seen, each of these activities is regulated by New Jersey insurance law. That law prohibits the sale of a liability insurance policy in the state except in accordance with an approved rating-system on file with the Commissioner. N.J.S.A. 17:29A-15. The state licenses rating bureaus, regulates their membership, and affirmatively encourages their use. N.J.S.A. 17:29A-2(1)-(3). Differences between mass marketing (group) and individual policies, as well as rates and classifications of policies, are all subject to control by the Commissioner of Insurance. N.J.S.A. 17:29A-4; N.J.A.C. 11:2-12.1 to 12.15. Regulation even reaches across the state lines to assure that in deciding on the propriety of New Jersey rating-systems, experience in other states is taken into account. N.J.S.A. 17:29A-5. The appointment of agents is also regulated by state law. N.J.S.A. 17:22-6.15, 6.20. No commissions may be paid to an unlicensed broker or agent. N.J.S.A. 17:22-6.18.
 
 
 32
 Plainly, in the four respects set forth in the preceding paragraph, the business of insurance is regulated by New Jersey law. Thus before Owens can successfully resist a summary judgment on his Sherman Act claims, he must raise a genuine issue of material fact suggesting that the activities of which he complains either are outside those four areas, or if within them, amount to a boycott, coercion or intimidation.
 
 IV.
 
 33
 With the foregoing interrelated regulatory schemes in mind we turn to Owens' three claimed antitrust violations; the combination or conspiracy to give Chubb a monopoly in the New Jersey medical malpractice field, the boycott claim, and the conspiracy to drive him out of business. Each requires separate analysis.
 
 A.
 
 34
 As to the market division charge, we may assume, without deciding, (1) that a naked agreement between insurance companies to divide markets geographically, not the subject of state regulation, does fall within the proscriptions of the Sherman Act if it has the required effect on competition, cf. United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); and (2) that insurance brokers may be injured in their business or property by such an agreement. Moreover, reading the amended complaint generously, we do assume that Owens could attempt to prove such a naked agreement not regulated by state law. We are not, however, reviewing the grant of a Rule 12(b)(6) motion, but rather the grant of summary judgment after the compilation of an extended record. That record includes 36 volumes of deposition testimony, extensive interrogatories and admissions, and affidavits in support of and in opposition to Aetna's summary judgment motion. It establishes no issue of material fact as to what Owens could hope to establish at trial.
 
 
 35
 Neither in his pleadings and affidavits in the district court nor here did Owens advance any theory of liability based on concert of action with respect to withdrawal from the New Jersey market among the Aetna Defendants alone. Both the amended complaint and his legal argument posit concert of action between the Aetna Defendants on the one hand and Chubb and the Britton Agency on the other. However, despite an ample opportunity to develop it, Owens presented no evidence from which an inference could be drawn of any such concert of action outside the field of concerted activity authorized and regulated by New Jersey.
 
 
 36
 The starting point for analysis must be Owens' complaint in which he alleges that in 1974 he was an independent agent for Aetna specializing in solicitation of individual policies of medical malpractice insurance. He charges that
 
 
 37
 (D)uring 1974, AETNA was seeking through Insurance Services Office of New York an unjustifiable rate increase from the New Jersey Insurance Department which would put plaintiff out of business and enable defendants CHUBB & SON, INC., FEDERAL INSURANCE CO., and JOSEPH A. BRITTON AGENCY to acquire plaintiff's lucrative business and clientele and having a direct effect of enabling AETNA to abandon the State of New Jersey as far as medical malpractice is concerned which they would not have otherwise been permitted to do.
 
 
 38
 (Amended Complaint, paragraph 31). It is established in the record (JA 56), and undisputed, that Insurance Service Office is a rating bureau of which Aetna is a member. There is no dispute that Aetna did "abandon" writing medical malpractice insurance in New Jersey in 1974. In a deposition, Robert S. Hansen, Vice President of the Aetna Life and Casualty Co., testified:
 
 
 39
 Q Does Aetna sell medical malpractice insurance in New Jersey?
 
 
 40
 A No, we do not.
 
 
 41
 Q Did Aetna ever sell medical malpractice insurance in New Jersey?
 
 
 42
 A Yes, we did.
 
 
 43
 Q When did it cease writing medical malpractice insurance in New Jersey?
 
 
 44
 A I would say sometime in 1974.
 
 
 45
 Q Did Aetna cease writing medical malpractice insurance elsewhere in the United States at or about that time?
 
 
 46
 A Yes, we did. In fact, we ceased writing it in most of the United States at that time.
 
 
 47
 Q Were you involved in the decision which was reached by Aetna with respect to those matters?
 
 
 48
 A Yes, I was.
 
 
 49
 Q Are you familiar with the reasons for which Aetna withdrew from the medical malpractice market generally in the United States and from New Jersey in particular?
 
 
 50
 A Yes, I am.
 
 
 51
 Q How did you learn of those reasons?
 
 
 52
 A I was a member of the Frazer Shipps' staff that participated in making the decision and formulating the company position.
 
 
 53
 Q Can you tell us what decisions were reached in 1974 with respect to the offering of medical malpractice insurance generally in the United States by Aetna?
 
 
 54
 A Well, the prime decision was that we continue in the malpractice business in the states where we were sponsored by the Medical Association and wrote the Association's business, and that we would monitor that business very carefully and very closely to ascertain how it was performing from a profit and loss standpoint.
 
 
 55
 We also decided that we would withdraw from other states where we did not have an association relationship and we had inadequate rates. The inadequate rates absent the Association business became a prime criteria. Even if we had adequate rates but we didn't have a large segment of the business we would withdraw from those states, and if we had adequate rates but we were providing a large segment of the market if we had a large segment of the market and there was no association program we would stay in if in our opinion or our evaluation there would be no remaining market in that particular state. That was a social responsibility decision in order not to deprive the medical profession of a market.
 
 
 56
 Q Do you know why these decisions were reached by Aetna?A Well, what triggered the decisions was because of our past losses, if that is what you are referring to. We had not been able to produce a profit in the professional liability line, I think it was for something like ten years prior to 1974, and I know I do recall that when I took over in 1972 the previous year we had generated about a fifteen million dollar loss, and in '72 that went to about twenty million, and in '73 it accelerated to about twenty-four million, and we were under a great deal of pressure from our president who at that time was Donald M. Johnson, to withdraw from the professional liability line altogether, but in our opinion we figured if there was any money to be made in the professional liability lines it was to be made in the group business, and we pressed upon him at the time to permit us to continue in the line in the states where we had the association business.
 
 
 57
 Q Why did you feel it was more likely that you would be able to make a profit in the states where you would have the sponsorship of the medical association?
 
 
 58
 A Well, first of all, you have direct contact with the medical society and the membership of the association, which is extremely important in establishing a relationship, and also extremely important to have the support of that group when you attempt to secure some appropriate rate levels or adequate rate levels from an insurance department.
 
 
 59
 Secondly, by writing the association, you get a much greater penetration of the available market, a better market share, which gives you a better spread of risk, which automatically enhances your opportunity for profit, and you have the opportunity to implement loss control and education programs with the profession that you don't otherwise have, particularly participating with them or encouraging them in their review meetings. That was one of the requirements of our participation with the group, where they sat in judgment of their own membership.
 
 
 60
 Q Were you involved in the decisions which were made with respect to particular states as to whether to remain or withdraw from medical malpractice?
 
 
 61
 A Yes, I was.
 
 
 62
 Q Can you tell us what was decided with respect to the State of New Jersey and why?
 
 
 63
 A Yes. In New Jersey we applied the criteria that I previously mentioned here, and in New Jersey we were not sponsored by the State Medical Association. We had inadequate rates and we had a very small market share.
 
 
 64
 (Hansen Deposition at 4-7). Thus, Hansen's version of the decision to offer group coverage only, and that only in some states not including New Jersey, is that it was a unilateral business decision, based on the absence of a relationship between Aetna and the New Jersey Medical Society, without which Aetna could not make an underwriting profit. Obviously such a unilateral decision could not sustain a Sherman Act charge. On the other hand, if the decision were made in consultation with Chubb, Owens might be able to prove such a charge. But Aetna unequivocally denied such consultation. Hansen testified:
 
 
 65
 Q Did you ever discuss Aetna's withdrawal from the medical malpractice market generally in the United States or in New Jersey in particular either before or after it was made with any representative of Chubb & Son, Federal Insurance Company, or any other insurance carrier?
 
 
 66
 A No, I did not.
 
 
 67
 Q To your knowledge did Frazer Shipps ever have such a discussion with Chubb & Son, Federal or any other insurance company?
 
 
 68
 A No.
 
 
 69
 Q To your knowledge did any Aetna executives who were responsible for the decision (to) withdraw from the medical malpractice market have any discussions with any representative of another insurance company concerning Aetna's withdrawal prior to the making of that decision?
 
 
 70
 A No.
 
 
 71
 Q Are you aware of any agreement among any insurance carriers to divide up the medical malpractice market in the United States or in New Jersey?
 
 
 72
 A No.
 
 
 73
 Q Did you consider the views of any other insurance company when it was decided that Aetna would withdraw from the malpractice market generally and from New Jersey in particular?
 
 
 74
 A No.
 
 
 75
 Q Do you know if any of the other executives who were involved in that decision considered the views of any other insurance company?
 
 
 76
 A I have no knowledge of any such consideration.
 
 
 77
 Q Did Mr. Shipps ever tell you that he had discussions with any other insurance carrier concerning the medical malpractice market in the United States generally or in New Jersey in particular?
 
 
 78
 A No, he did not.
 
 
 79
 Q Do you have any knowledge whether any of the Aetna directors in 1974 met with any of the directors of Chubb & Son or Federal Insurance Company to discuss medical malpractice?
 
 
 80
 A No.
 
 
 81
 Q In 1974 did you know whether Aetna was a group underwriter for homeowner insurance and automobile insurance for the Medical Society of New Jersey?
 
 
 82
 A No, I did not.
 
 
 83
 (Hansen Deposition at 11-12).
 
 
 84
 Faced with Aetna's unequivocal denial of concert of action with the alleged co-conspirators, Owens, in resisting a motion for summary judgment, was required to come forward with some evidence to the contrary. He relies on three specific items.
 
 
 85
 The first is exhibit A to the amended complaint, in which Aetna, in announcing its withdrawal from the business of selling individual malpractice policies, advised its authorized agents that if they could not place individual policies with other companies, they could refer their customers to the Medical Society's sponsored carrier.[7] Owens would have a fact finder draw the inference that since the agents were informed of the Medical Society mass market plan, there must have been a conspiracy. The letter simply does not support such an inference. It does no more than call to insurance agents' attention information about a group coverage that was public information.
 
 
 86
 As further support for an inference of conspiracy Owens' unverified amended complaint charges:
 
 
 87
 In return for Aetna's abandoning the medical malpractice insurance market in the State of New Jersey, it was to receive the exclusive sponsorship of the automobile and homeowners insurance business by The Medical Society of New Jersey for its members to be written only by E. W. BLANKSTEEN, INC., all in violation of 15 U.S.Code Sections 1 and 2.
 
 
 88
 (Amended Complaint, paragraph 34). We need not consider whether this allegation, if true, would support a Sherman Act charge not within the McCarran-Ferguson exemption, for the allegation is unequivocally denied both by affidavit and in deposition testimony. The affidavit of defendant Slayton states:
 
 
 89
 Plaintiff's allegations is contradicted by the facts. It is true that Aetna underwrote the group insurance plan providing automobile and homeowners' insurance for the members of the Medical Society of New Jersey. However, I am informed that Aetna had carried this insurance since March 1, 1973, pursuant to a contract with the Medical Society executed November 15, 1972 more than a year and a half before Aetna decided to stop selling malpractice insurance in New Jersey.
 
 
 90
 (JA 59). On deposition Hansen testified:
 
 
 91
 Q Did the Aetna decision to withdraw in New Jersey have anything to do with the fact that the Medical Association was the sponsor for its group homeowner insurance and automobile insurance?
 
 
 92
 A Positively not.
 
 
 93
 (Hansen Deposition at 12-13). In the face of these unequivocal denials Owens referred the district court to no evidence which would support a contrary inference.
 
 
 94
 Finally and critically, Owens relies on the charge in his complaint that Aetna combined with other defendants, operating through the Insurance Service Office rating bureau, to file a high individual policy rate in 1974 (Amended Complaint, paragraphs 31 & 41), a charge Aetna's official denied. (Hansen Deposition at 51). Plainly, rating bureau activity requires joint action. Since both the letter to its agents and Aetna's antecedent relationship with the Medical Society on a mass market automobile policy have been rejected as legally insufficient to support an inference of concerted action, Owens must ask us to infer it from the rating bureau activity mentioned in the complaint.
 
 
 95
 Drawing all inferences from the affidavits, interrogatories, depositions and admissions most favorably to the plaintiff, we will assume that, acting in concert with other members of the rating bureau, Aetna in 1974 decided to provide medical malpractice coverage only at group rates through state medical societies. We will assume further that it did not file this rating-system in New Jersey, but instead filed a very high individual policy rate, at the same time that Chubb filed an "artificially low" rate increase for its Medical Society Group policy. (Owens Affidavit in Opposition to Motion for Summary Judgment, paragraph 54). If that rating bureau decision occurred and was accepted by the New Jersey Commissioner of Insurance, it had the inevitable effect of freeing the Britton Agency and Chubb from the competition offered by brokers selling the individual policies formerly issued by rating bureau members.
 
 
 96
 An affidavit of Eugene J. Cudworth, filed on Owens' behalf, and heavily emphasized in plaintiff's brief, confirms that concerted action with respect to group insurance is, indeed, the heart of Owens' Sherman Act complaint:
 
 
 97
 5. William Owens approached me at the Hartford in mid-1974. At that time principal insurers of physicians malpractice had decided and planned that the most profitable way of underwriting that line was to maximize state medical society group-sponsored business on a state-by-state basis. One designated carrier would provide the protection in a designated state such as Aetna in Connecticut or Chubb in New Jersey, etc. This would enable the society's sponsored carrier to be the source of coverage for all the physician classes for all society members and obtain desired rates when dealing from such strength with the state's regulatory authority. Owens advised that he had sold his business and joined the firm of McCay Corp., one of Hartford's New Jersey agents, to sell physicians insurance but that McCay had suddenly lost its malpractice market and he had no product with which to compete against Chubb in the state.
 
 
 98
 6. As Owens explained it, referring to designated market plans, only organized groups, like state medical societies and associations, seemed to get malpractice insurance so his idea was to organize his own group in New Jersey. He would use his expertise to enroll only the better-grade physician insurance risk as members. He submitted that his projected quality ought to be attractive to a prospective insurer, he knew my dedication to careful risk acquisition from the past when he had selected risk for me.
 
 
 99
 7. I was interested in Owens' idea. It was a novel approach to what had always been a major problem with group insureds with the malpractice line. Mere membership in any group would then qualify members, good and bad risks, for coverage under the group insurance concept. Surcharging bad risks had not proven efficacious. Owens further proposed to enroll all of his high quality or carefully screened members in New Jersey away from counties near New York City (a notorious malpractice breeding ground). The Hartford was definitely interested.
 
 
 100
 (JA 61-62). The Hartford, which may have been a member of the same rating bureau as Aetna, was definitely interested, not in seeking individual policyholders, but in forming a new doctors group, the Association of Professionals for Economic Defense, Inc. (A.P.E.D.), which would siphon off preferred risks from the Medical Society insurance plan to a new mass-marketing policy. As Cudworth explained:
 
 
 101
 In return for Owens' screened A.P.E.D. body of quality risk, we would then deviate (discount) Chubb's medical society rates by 20% across all the M.D. specialty classifications used by Chubb (excluding anesthesiology which Owens would not acquire).
 
 
 102
 (JA 63). The discount, as the next paragraph in Cudworth's affidavit makes clear, could not be offered by unilateral action on Hartford's part. It required approval of a new rate filing by the New Jersey Commissioner of Insurance. The same, of course, would have been true of any such filing by Aetna, which did not have an existing relationship with New Jersey Medical Society, and which, on the evidence of the letter to its agents quoted above, simply was not interested in attempting to continue the practice of competing for preferred malpractice risks. The inference that Owens apparently would have us draw is that as a result of concerted action in the rating bureau Aetna declined to do what he was proposing that Hartford should do namely file its own competitive group rate. There are, however, two defects fatal to Owens' theory of liability.
 
 
 103
 The first is that it depends upon some form of combination, conspiracy or agreement among the Aetna and the Chubb defendants. Yet, Aetna has unequivocally denied such an agreement, and any inference that there was such concerted action through the rating bureau is conclusively negated by the affidavit of Robert J. Nugent, filed on Owens' behalf, that Chubb's Federal Insurance Company was not a bureau company for medical malpractice insurance in 1974. Thus Chubb and Aetna, on Owens' own evidence, cannot be placed in the organization's membership from which we are asked to infer concert of action. No other item of evidence supplies the conspiracy element.[8]
 
 
 104
 An equally fundamental defect in Owens' theory of liability, however, is that even if Aetna and Chubb were both members of Insurance Service Office, and cooperated in the decision to file in New Jersey only a single mass market rating-schedule, and perhaps a very high individual policy rate, that activity would fall within even the narrowest reading of the McCarran-Ferguson exemption; for as demonstrated in Part III above, that is part of the business of insurance, and as outlined in Part II, it is activity comprehensively regulated by the State of New Jersey. Indeed, by approving the rate filings, the New Jersey Commissioner presumably approved of the inevitable effect they would have on Owens and other brokers not affiliated with the state Medical Society.
 
 
 105
 Thus we conclude that the trial court properly granted summary judgment on Owens' market division claims.
 
 B.
 
 106
 In the district court and on appeal, Owens argues that even if the alleged conspiracy to divide the market for medical malpractice insurance does constitute the business of insurance and is regulated by the state, the McCarran-Ferguson Act's Section 2(b) exemption is nevertheless inapplicable because Aetna engaged in an agreement to boycott, coerce or intimidate Owens actionable under Section 3(b). In its opinion granting Aetna's motion for summary judgment, the district court noted that plaintiff's claim against Aetna for boycott was grounded on a letter by Aetna of August 21, 1974 to its agents announcing its withdrawal from the New Jersey medical malpractice market. Of that letter, the court said "Under no conceivable circumstances could it constitute a boycott of plaintiff's business." On appeal, Owens contends that the district court erroneously applied a narrow, confining and arbitrary definition of the term "boycott" which is inconsistent with the Supreme Court's decision in St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978).
 
 
 107
 We agree with Owens that in the St. Paul case the Supreme Court held that the term "boycott" as used in Section 3(b) of the McCarran-Ferguson Act must be given the same breadth of definition and scope as under the Sherman Act. Assuming then that the defendants participated in a rating bureau decision to boycott Owens or engaged in some other concerted refusal to deal with him, such an agreement would not be protected by the McCarran-Ferguson exemption. However, concert of action remains a sine qua non in a boycott case. St. Paul Fire & Marine Insurance Co. v. Barry, supra, 438 U.S. at 554, 98 S.Ct. at 2936. Thus, our holding in Part IV-A above that there is no evidence whatever of concert of action, even within a rating bureau, is dispositive of Owens' boycott claim as well.[9]
 
 
 108
 Owens argues that if the effect of the division of markets was to exclude him from the malpractice insurance market, that constituted a Sherman Act boycott. Owens cites no authority for that proposition. Obviously, if the remaining malpractice insurer had been willing to deal with him, he would have no boycott complaint, notwithstanding the division of markets. From our analysis of the record it appears that Owens is really complaining about the relationship between the remaining malpractice insurer, Chubb, and its exclusive agent, the Britton Agency, which deprived Owens of a direct source of insurance. Grant of an exclusive agency is subject to scrutiny under the antitrust laws as to its purpose and effect, but it is not equated with a boycott.[10] Moreover, the Aetna Defendants were in no way connected with the grant by Chubb of an exclusive agency to Britton Agency. Finally, we note that in the amended complaint Owens concedes that he could have continued to place malpractice insurance with Britton Agency, though at a reduced premium. (Paragraph 47). Therefore, we affirm the district court's holding that Owens failed to produce any evidence to support his claim that section 3(b) of the McCarran-Ferguson Act was inapplicable.
 
 C.
 
 109
 Turning to Owens' claim that there was a conspiracy to drive him out of business, we note that he devotes no attention to that claim in his briefs on appeal. Thus it may be his position that this claim was predicated on New Jersey law, and hence has been abandoned. Certainly the district court dealt with the contention that he was fraudulently induced to sell his business, and with the Newsletter the New Jersey Medical Association published in August 1974 warning its members about dealing with the A.P.E.D. group Owens was forming. Owens does not contend that the court erred in granting summary judgment for the Aetna Defendants on any state law claim based on those events. No separate discussion of a conspiracy, in violation of the Sherman Act § 1, to drive him out of business can be found in the trial court's memorandum on the motion for summary judgment. In its absence, and without briefing on the subject by Owens, we have examined the extensive record for any indication of an issue of material fact suggesting Aetna's participation in such a conspiracy. We have found none. The judgment appealed from properly disposes of this claim and all others against the Aetna Defendants.
 
 V.
 
 110
 The judgment appealed from will be affirmed.
 
 
 111
 SLOVITER, Circuit Judge, dissenting.
 
 I.
 
 112
 The majority opinion is a paradigm of the existentialist statement by Humpty Dumpty that words mean what he says they mean,[1] or, as in this case, that the issue is what the majority says it is. In essence, Judge Gibbons analyzes the conspiracy alleged as if it were that Aetna, acting in concert with other members of the rating bureau, decided to provide medical malpractice coverage only at group rates through state medical societies. He then concludes that such activity is the business of insurance and therefore qualifies for treatment under the McCarran-Ferguson Act exemption to the Sherman Act, that it is regulated by New Jersey state law, and that the boycott exception is inapplicable. As for the division of markets claim which the majority acknowledges is raised, the majority finds that plaintiff has failed to produce sufficient evidence to raise a genuine issue of material fact, and therefore affirms the grant of summary judgment.
 
 
 113
 Viewed in isolation, the majority makes a plausible construction of the McCarran-Ferguson Act applied to its version of this case. If the conspiracy alleged were limited to joint action with regard to preparation of a rating schedule, filed through the rating bureau, or with regard to the price of group insurance, I would find it difficult to dissent from the proposition advanced by the majority that such alleged activities fall within the "business of insurance." However, I find one elementary and overriding flaw in the majority's analysis: it deals with an issue that was not presented to the district court in support of Aetna's motion for summary judgment; it is an issue not considered or decided by the district court in granting summary judgment; and it is an issue on which defendant Aetna did not rely either in its brief or at argument before us. While appellate courts have the power to grant summary judgment on grounds other than those relied upon by the district court, this is patently not an appropriate situation for application of that power.[2]
 
 
 114
 I appreciate the desire of the majority to attempt to make some order out of the somewhat rambling effort of plaintiff to find a viable claim to remedy a perceived wrong. However, the fact is that this was not a case orchestrated by the able analytical hand of Judge Gibbons, however much it would have benefited thereby. To identify the issue appropriately before us, we must resort to the district court's analysis and the briefs and arguments of the parties before us.
 
 
 115
 Turning first to the district court's opinion, the court recognized that "(p) laintiff's complaint is fraught with side issues that fail to bolster any genuine claim he may have against Aetna defendants." Therefore, the district court struck "all references and claims with regard to alleged unjustifiable rate increases for medical malpractice insurance." The court found that "whether Aetna was or was not granted a rate increase and the propriety of such proceedings are totally irrelevant with regard to any cause of action which may survive between plaintiff and Aetna defendants." Joint Appendix 151. Plaintiff did not appeal this action by the district court. Thus, I believe the majority errs in attempting to reconstruct a somewhat modified antitrust claim relating in any way to rates for malpractice insurance. The district court then turned to its analysis of "plaintiff's suit as it presently stands against the Aetna defendants" and found it was "limited to two major issues": the first being the antitrust claims and the second being the libel claim, not relevant here.
 
 
 116
 As to the antitrust claims, the complete summary of those claims by the district court was as follows:
 
 
 117
 Plaintiff alleges illegal division of insurance markets in New Jersey between Aetna, Chubb and Federal. He theorizes that the agencies conspired to reduce medical malpractice losses by splitting up states in which each would offer that coverage, thus effectively creating a monopoly for the one remaining in the field. This would be accomplished through an organized group such as NJMS. In exchange, the company withdrawing would have the exclusive market with group members for automobile and homeowners insurance.
 
 
 118
 A reading of the issue as framed by the district court discloses that it construed plaintiff's claim, as it evolved by the time of the grant of summary judgment, to be that Aetna, Chubb and Federal engaged in both a geographic market division, "splitting up states," and a customer division, allocating to the alleged conspirators the types of insurance which each would sell within New Jersey. While the stimulus for the alleged conspiracy may have been the desire to operate through group marketing plans for malpractice insurance, this cannot mask the essence of the allegations that such a program entails a geographic market division. I therefore find the majority's discussion of rate making through rating bureaus gratuitous to this case in its present posture.
 
 
 119
 Turning then to the majority's treatment of the true issue before us, the grant of summary judgment on the market division claim, the majority affirms the district court on the ground that plaintiff has failed to come forward with a showing that there is issue of material fact. It is important, I believe, to iterate and reiterate that this was not the basis on which the district court granted summary judgment on the antitrust claims. Indeed, analysis of Aetna's Motion for Summary Judgment and the Memorandum in support, filed in the district court, discloses that this was not the basis of its claim for summary judgment.[3] This is confirmed by Aetna's position in its brief filed before us, where it stated:
 
 
 120
 With respect to the second antitrust claim (alleging a division of markets), the Aetna defendants did not rely on the paucity of plaintiff's evidence of any such agreement, but rather demonstrated that this claim was subject to dismissal on two distinct legal grounds. These are, first, that the alleged conduct is within the "business of insurance" and as such is exempt from the antitrust laws under the McCarran-Ferguson Act; and second, that the claim of an alleged market division is one that plaintiff lacks standing to assert. Aetna's brief at 3 (emphasis added).
 
 
 121
 Thus, plaintiff appearing as appellant before us never had the opportunity to argue that it had produced enough evidence to withstand summary judgment on that ground. As the majority acknowledges, the record in this case is extensive, with boxes of depositions and answers to interrogatories. An appellate court cannot be expected to conduct its own inquiry into the presence or absence of such evidence. The majority is apparently satisfied that it can do so. However, one might question why, if the absence of evidence is as clear as the majority believes, experienced counsel for Aetna failed to raise that issue as an alternative basis for its motion. It may be that it recognized there was indeed enough evidence to withstand a motion on that basis.[4] I believe that the appropriate procedure would be to remand and permit the parties to argue this issue before the district court, which is in the unique position to make the requisite findings.
 
 
 122
 By its treatment of the issues in this case, the majority avoids reaching the difficult legal issue which was decided by the district court and argued before us by the parties, i. e., whether a conspiracy by insurance companies to divide markets can be construed as a matter of law to constitute "the business of insurance" within the meaning of the McCarran-Ferguson Act. The district court, without specifically referring to the types of market division involved, concluded that it was "the business of insurance," that it was effectively regulated by New Jersey, and consequently that the alleged market division conspiracy was exempted from the antitrust laws under that Act. Because I believe that there was an inadequate basis for the court to have reached the legal conclusions on which it based its judgment, I would vacate the entry of summary judgment and remand for further proceedings if the legal issue were to be reached.
 
 II.
 
 123
 The district court's grant of summary judgment on the ground that plaintiff's market division claim is barred as a matter of law raises a question of first impression. The parties have not cited nor has independent research uncovered any case which considers whether alleged market division by insurance companies and resulting monopolization is exempt from the antitrust laws by virtue of the McCarran-Ferguson provision. If the construction of the statute cannot be derived from its literal language, then it is necessary to analyze the purpose of the legislation as "illumined by any light to be found in the structure of the Act and its legislative history." Group Life & Health Ins. Co. v. Royal Drug Co. (Royal Drug), 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979).
 
 The McCarran-Ferguson Act provides:
 
 124
 Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
 
 
 125
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.
 
 
 126
 (Sec. 3.) (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.
 
 
 127
 59 Stat. 33-34, as amended, 61 Stat. 448 (codified at 15 U.S.C. §§ 1012-1013 (1976)).
 
 
 128
 A determination of whether the McCarran-Ferguson exemption applies to particular conduct entails three distinct inquiries:
 
 
 129
 (1) Does the conduct constitute the business of insurance?
 
 
 130
 (2) Is that conduct regulated by state law?
 
 
 131
 (3) Does the conduct constitute boycott, coercion, or intimidation?
 
 
 132
 In this case, the district court answered the first two questions affirmatively, and the third negatively. The court held, "I am satisfied that the relationship between plaintiff as insurance agent and Aetna as insurance company constitutes the 'business of insurance' as it has been defined by the courts." (emphasis added). The court then held that the State of New Jersey "had effectively regulated the insurance business and has evidenced its intent to occupy the field to the fullest extent of the power granted by the McCarran-Ferguson Act." The court cited N.J.Stat.Ann. § 17:29B-4 (West Supp.1980), a New Jersey statute which describes unfair methods of competition and unfair or deceptive acts or practices, and specifically referred to subparagraph (11), a catch-all clause, which provides that:
 
 
 133
 The enumeration of this act of specific unfair methods of competition and unfair and deceptive acts and practices in the business of insurance is not exclusive or restrictive or intended to limit the powers of the commissioner or any court of review under the provisions of section 9 of this act.
 
 
 134
 Finally, the court examined plaintiff's evidence of an alleged boycott and found it wanting, and accordingly found the boycott exception to the McCarran-Ferguson exemption unavailable to Owens. I do not differ with the majority's conclusion that the boycott exception in section 3(b) of the McCarran-Ferguson Act is inapplicable in this case and therefore I address only whether the alleged division of markets constitutes "the business of insurance" and whether it is regulated by New Jersey law.
 
 A.
 
 135
 It is clear from the Royal Drug decision that the inquiry into whether the challenged conduct constitutes "the business of insurance" must be directed to the conduct or agreement which allegedly violates the antitrust laws, in this case, the agreement to divide the market. See 440 U.S. at 210, 211, 99 S.Ct. at 1073. Thus the district court misperceived the focus of its inquiry by confining it to the relationship "between plaintiff as insurance agent and Aetna as insurance company."
 
 
 136
 Although the literal language of the McCarran-Ferguson Act contains no definition of the "business of insurance," the history and purpose of the statute and the meaning of the phrase were thoroughly explored in the Supreme Court's recent Royal Drug decision. At the outset, it must be noted "that the statutory language in question here does not exempt the business of insurance companies from the scope of the antitrust laws. The exemption is for the 'business of insurance,' not the 'business of insurers.' " Royal Drug, 440 U.S. at 210-11, 99 S.Ct. at 1072-1073.
 
 
 137
 For the 75 years preceding 1944, it was assumed that issuance of "a policy of insurance is not a transaction of commerce." Paul v. Virginia, 75 U.S. 168, 8 Wall. 168, 183, 19 L.Ed. 357 (1869). The insurance industry developed in the belief that it was under the exclusive regulation of the states and beyond the reach of federal law, including the subsequently enacted Sherman Act. In United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), the Supreme Court held that the Sherman Act could constitutionally reach the business of insurance, thus precipitating a flurry of legislative activity. There was serious concern by the states that their ability to tax and regulate the business of insurance was now uncertain in light of the "precedent-smashing decision in the South-Eastern Underwriters case." H.R.Rep.No.143, 79th Cong., 1st Sess., 2-3 (1945). Therefore, the "primary purpose" of Congress in enacting the McCarran-Ferguson Act was to "(free) the States to continue to regulate and tax the business of insurance companies, in spite of the Commerce Clause;"[5] the "secondary purpose of the McCarran-Ferguson Act (was) to give insurance companies only a limited exemption from the antitrust laws." Royal Drug, 440 U.S. at 218-19 n.18, 99 S.Ct. at 1077 n.18 (emphasis in original). Significantly, three bills which would have given the insurance industry an absolute immunity from the antitrust laws were introduced, and failed.[6]
 
 
 138
 In Royal Drug the Court interpreted this legislative history to require a narrow construction of the McCarran-Ferguson exemption.[7] The Court stated:It is true that § 2(b) of the Act does create a partial exemption from (the antitrust laws). Perhaps more significantly, however, that section, and the Act as a whole, embody a legislative rejection of the concept that the insurance industry is outside the scope of the antitrust laws a concept that had prevailed before the South-Eastern Underwriters decision.
 
 
 139
 440 U.S. at 220, 99 S.Ct. at 1077.
 
 
 140
 The issue in Royal Drug was whether agreements between a Blue Shield Association and participating pharmacies (providers) setting the terms under which those pharmacies would deliver drugs to Blue Shield's insureds constituted the "business of insurance." The legality of the agreements was challenged by nonparticipating pharmacies. In holding that the agreements with providers did not constitute the "business of insurance," the Court concluded that the "primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk," elements that were absent from the pharmacy agreements. Id. at 211, 212-13, 99 S.Ct. at 1073-1074. Royal Drug had argued that the pharmacy agreements did underwrite the risk that its policyholders would need drugs. The Court rejected this argument finding that the argument confused Blue Shield's obligations to its policyholder under its policies, which do underwrite risk, and the pharmacy agreements, which served only to minimize the costs Blue Shield incurred in fulfilling its underwriting obligations. In the Court's view, the pharmacy agreements were legally indistinguishable from "countless other business arrangements that may be made by insurance companies to keep their costs low and thereby also keep low the level of premiums charged to their policyholders." Id. at 215, 99 S.Ct. at 1075. Such cost savings agreements may be sound business practice but, the Court held, they are not the business of insurance.
 
 
 141
 The Court also stated that "(a)nother commonly understood aspect of the business of insurance relates to the contract between the insurer and insured." Id. The Court quoted the following excerpt from its opinion in SEC v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969):
 
 
 142
 The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was it was on the relationship between the insurance company and the policyholder.
 
 
 143
 In Royal Drug the pharmacy agreements were not between the insurer and insured. Furthermore, the Court rejected Blue Shield's argument that the agreements so closely affect the "reliability, interpretation, and enforcement" of the insurance contract and "relate so closely to their status as reliable insurers" as to fall within the exempted area. Such an argument, the Court commented, proves too much since almost every business decision affects the costs of an insurance company and thus has some impact on its reliability and rate-making.
 
 
 144
 Both the majority and dissent in Royal Drug focused on aspects of the insurance business in reaching their respective, albeit different, conclusions. The realities of that business must also be considered at some length in analyzing whether a division of markets can be considered to be "the business of insurance." At issue here is the portion of the insurance industry concerned with property-liability insurance, which insures individuals and commercial enterprises against loss or damage to the insured's property caused by such perils as fire, theft and collision, and against losses arising out of the insured's legal liability for injuries to other persons or damage to their property. See U.S. Department of Justice Study, The Pricing and Marketing of Insurance 7 (1977) (hereafter Dept. of Justice Study).[8] About two-thirds of property-liability insurance is marketed through independent agents; the remainder is written directly by the insurance company. Id. at 9. See generally R. Riegel, J. Miller, C. Williams Jr., Insurance Principles and Practice: Property and Liability (6th ed. 1976).
 
 
 145
 Liability insurance companies are able to accept the risk of a large loss, charging only a fraction of their potential liability, because they accept a large number of such risks, only some of which will result in losses, thereby spreading such losses over all the risks accepted. See 1 G. Couch, Couch on Insurance 2d § 1.3 (2d ed. 1959). The company must set its premiums based on its prediction of two cost variables: the probability of a particular risk of loss occurring and the magnitude of the loss if it occurs. See Sullivan & Wiley, Recent Antitrust Developments: Defining the Scope of Exemptions, Expanding Coverage, and Refining the Rule of Reason, 27 U.C.L.A.L.Rev. 265, 282 (1979).
 
 
 146
 To insure solvency, the prediction of future losses must be accurate. Predictions will be most credible if based on the loss experience of a large homogeneous class of risks over a period of time. Dept. of Justice Study, supra, at 152-154. To this end, individual insurance firms share their information about the frequency and magnitude of various losses in order to develop a reliable statistical base for rates. Sullivan & Wiley, supra, at 269. This information sharing has traditionally been accomplished by industry rating bureaus that typically aggregate statistical information, "trend" past data to make it useful for projecting future losses, and establish standard rates for different risk categories. National Commission for the Review of Antitrust Laws and Procedures, Report to the President and Attorney General, 237 (1979) (hereafter Report to the President ); Dept. of Justice Study, supra, at 146-66, 188-221. As the majority emphasizes, these rating bureaus and the rates established are generally subject to state regulatory oversight.[9] Hanson, The Interplay of the Regimes of Antitrust, Competition and State Insurance Regulation on the Business of Insurance, 28 Drake L.Rev. 767, 803 (1978-79); Report to the President, supra, at 231.
 
 
 147
 Because the availability of reliable loss statistics for a particular risk is essential to the insurance of that risk where the losses connected with a particular risk cannot be predicted, the risk will not be insured. For example, in the medical malpractice field there are substantial difficulties in predicting future loss experience in part because the losses being underwritten by the current premium may not be determined until several years have elapsed (the so-called long-tail problem), and in part because the small number of insureds does not provide an adequate statistical basis for sophisticated actuarial techniques. Medical Malpractice Insurance Hearing before the Subcomm. on Health and the Environment of the House Comm. on Interstate and Foreign Commerce on Medical Malpractice Insurance Issue and its Effect on the Delivery of Health Care Services, 94th Cong., 1st Sess. 44-47 (1975) (Report on the Medical Malpractice Insurance Crisis by the Association of the Bar of the City of New York). As a consequence, many companies selling malpractice insurance experienced net losses and chose to leave the medical malpractice market. Id. at 45. See, e. g., Annie M. Warner Hospital v. Harris, 639 F.2d 961 (3d Cir. 1981).
 
 
 148
 Some risks are so large or are of such an unusual nature that no one insurance company is willing or able to insure them alone, which has caused insurance companies to band together to share the risk through the mechanisms of pooling, placement and reinsurance. A "pool" is an association of insurers formed to write insurance for specific risks, such as nuclear reactors, aircraft, and railroad rolling stock. Hanson, supra, at 803-804.[10] The "placement" of insurance with an ad hoc association of insurers formed to insure a specific risk is also a common method to underwrite large risks that no one company is willing to handle alone. See Dept. of Justice Study, supra, at 201-205. Finally, insurers may attempt to spread the risk of a large loss through the mechanism of reinsurance, whereby the primary insurer cedes a portion of the risk to a reinsurer.[11] The benefit these various arrangements provide is that they give each insurer the opportunity to participate in a large number of risks, thereby increasing the probability that its losses will approximate the expected losses.
 
 
 149
 Obviously, the combinations necessary to accomplish the risk sharing central to these arrangements would raise serious questions as to legality under the antitrust laws. See, e. g., Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). They are, however, the essence of insurance; the industry could not survive without some or all of them.[12] As the Supreme Court noted, "it is very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation, the primary concern of both representatives of the insurance industry and the Congress (in providing) that cooperative ratemaking efforts be exempt from the antitrust laws." Royal Drug, 440 U.S. at 221, 99 S.Ct. at 1078.
 
 
 150
 On the other hand, an agreement to divide markets, whether geographically or by line of insurance, with a resultant monopoly of the market for malpractice insurance in New Jersey, does not appear to be comparable to the conduct traditionally assumed to have been exempted by the McCarran-Ferguson Act. That statute was enacted to protect the arrangements necessary to preserve the writing of insurance within and under regulation of the respective states. Whether one adopts the majority or dissenting view in Royal Drug, the scope of the statute can be no broader than protection of "insurance company activities that can rationally be claimed to need anticompetitive regulation." Sullivan & Wiley, supra at 284.[13] In Royal Drug the Court concluded, "It is next to impossible to assume that Congress could have thought that agreements (even by insurance companies) which provide for the purchase of goods and services from third parties at a set price are within the meaning of ("business of insurance")," id. at 230, 99 S.Ct. at 1082. It appears just as unlikely that Congress thought it was protecting agreements whereby an insurance company would completely withdraw from writing one type of insurance within the state. Aetna's argument seems to turn protection of the "business of insurance" into the "business of non-insurance."
 
 
 151
 I find support for my view that such a withdrawal, if made pursuant to an agreement among insurance companies, does not necessarily constitute the "business of insurance" in the additional following considerations:
 
 
 152
 (1) An agreement whereby a prior competitor leaves the market entirely entails an avoidance of risk by the departing company rather than a spreading of risk, which the Royal Drug Court held to be a "critical determinant." In relating the "business of insurance" to risk spreading, the Court stated "there is an important distinction between risk underwriting and risk reduction." Id. at 214 n.12, 99 S.Ct. at 1074 n.12. It would follow that complete risk avoidance is not encompassed within the exemption.
 
 
 153
 (2) When the McCarran-Ferguson Act was originally debated, those who favored broad exemption from the Sherman Act proposed that there should be specific enumeration of the practices which would be exempt from the antitrust laws. One of the congressional proponents of specificity argued that "some legislation should be passed which asserts the right of the States to control the questions of risks, rates, premiums, commissions, policies, investments, reinsurance, capital requirements, and items of that nature." 90 Cong.Rec. 6561 (1944). See Royal Drug, 440 U.S. at 222 n.29, 99 S.Ct. at 1078 n.29. The bill sponsored by the National Association of Insurance Commissioners enumerated seven specific practices to which the Sherman Act was not to apply.[14] Although these proposals were defeated in favor of a narrower exemption, the conspicuous absence from such proposals of monopoly, division of markets, and withdrawal from markets suggests that these were not deemed to be activities meriting protection.
 
 
 154
 (3) In St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), the Court considered the scope of the "boycott" exception in section 3(b) of the McCarran-Ferguson Act, but made some references which may help illume the meaning of the "business of insurance" in the same statute. The complaint in the St. Paul case alleged that four insurance companies writing medical malpractice insurance in Rhode Island engaged in a conspiracy in which three of the four companies refused to deal on any terms with the policyholders of the fourth company in order to compel those policyholders to accept the new policy terms proffered by the fourth company. In holding that such activity would not be protected by the McCarran-Ferguson Act because it constituted a "boycott", the Court stated:
 
 
 155
 The agreement binding petitioners erected a barrier between St. Paul's customers and any alternative source of the desired coverage, effectively foreclosing all possibility of competition anywhere in the relevant market. This concerted refusal to deal went well beyond a private agreement to fix rates and terms of coverage, as it denied policyholders the benefits of competition in vital matters such as claims policy and quality of service. Cf. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977). St. Paul's policyholders became the captives of their insurer. In a sense the agreement imposed an even greater restraint on competitive forces than a horizontal pact not to compete with respect to price, coverage, claims policy, and service, since the refusal to deal in any fashion reduced the likelihood that a competitor might have broken ranks as to one or more of the fixed terms.[25] The conduct alleged here is certainly not, in Senator O'Mahoney's terms, within the category of "agreements which can normally be made in the insurance business," 91 Cong.Rec. 1444 (1945), or "agreements and combinations in the public interests (sic) which can safely be permitted," id., at 1486.
 
 
 156
 Footnote 25 of the Court's opinion quotes the following excerpt from Professor Sullivan's Treatise:
 
 
 157
 25. "(E)ven where prices are rigidly fixed, the members of a cartel will be able to compete with each other with respect to product quality unless a homogeneous product is involved. Indeed, even if the product is homogeneous there will be room for rivalry in such matters as promptness in filling orders and the provision of ancillary services. An effective division of markets, by contrast, might substantially wash out all opportunity for rivalry." (L. Sullivan, Handbook of the Law of Antitrust) at 224-225.
 
 
 158
 Id. at 553 (emphasis added).
 
 
 159
 This language suggests that the Court considers that division of markets by insurance companies are not the type of agreements which the McCarran-Ferguson Act was designed to protect.
 
 
 160
 (4) Some further insight is provided by the Court's earlier decision in SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). When the SEC sought to challenge statements made in connection with shareholder approval of a merger of two insurance companies, the companies challenged SEC jurisdiction on the ground that the transaction was exempt under the McCarran-Ferguson Act by virtue of Arizona's regulation of "the business of insurance." The Court rejected the view that federal power was restricted because the state had approved the merger, and observed the distinction between state action permitting the companies to consummate the merger and state action ordering them to do so. Id. at 463, 89 S.Ct. at 570. In commenting on the sphere reserved primarily to the states by the McCarran-Ferguson Act, the Court noted:
 
 
 161
 Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply. Certainly the fixing of rates is part of this business; that is what South-Eastern Underwriters was all about. The selling and advertising of policies, FTC v. National Casualty Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), and the licensing of companies and their agents, cf. Robertson v. California, 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which Paul v. Virginia held was not "commerce."
 
 
 162
 Id. at 459-460, 89 S.Ct. at 568.
 
 
 163
 Following the National Securities decision, the contention that a merger of two multi-state insurance companies was exempted from § 7 of the Clayton Act by virtue of the McCarran-Ferguson Act was rejected, and the court held that the relationship between individual companies seeking to merge is not encompassed within the term "business of insurance." American General Insurance Co. v. FTC, 359 F.Supp. 887 (S.D.Tex.1973), aff'd on other grounds, 496 F.2d 197 (5th Cir. 1974). The effect of a merger on the market structure is not dissimilar from that of a division of territories or resulting monopoly.
 
 
 164
 (5) Congressional reluctance to sanction the establishment of monopolies pervades the entire field of regulated industries. See Maryland and Virginia Milk Producers Ass'n v. United States, 362 U.S. 458, 466-67, 80 S.Ct. 847, 853, 4 L.Ed.2d 880 (1960). In the rare instance where establishment of a monopoly may serve important public interests, Congress carefully defined the procedure to be followed and the considerations to be weighed. See Bank Merger Act of 1966, 12 U.S.C. § 1828(c)(5) (1976). See also 49 U.S.C. §§ 1378, 1384 (Supp. III 1979) (air carriers). In light of the history and evidence of Congressional concern with the establishment of monopolies, it is unlikely that the limited exemption embodied in the McCarran-Ferguson Act should be construed to permit agreements among insurance companies which result in establishment of a monopoly of a "designated" insurance company to write malpractice insurance coverage in each state.
 
 
 165
 Based on the foregoing considerations, I believe the district court erroneously concluded that the alleged agreement which resulted in Aetna's withdrawal from the New Jersey medical malpractice insurance market is the business of insurance. On the other hand, I would be reluctant to suggest that no agreement between insurance companies which may result in withdrawal from a market can ever be the business of insurance, because "(w)e do not know enough of the economic and business stuff out of which these arrangements emerge to be certain." See White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). The difficulties faced in trying to make malpractice insurance available to doctors and hospitals at a time when steeply rising losses make such risks unattractive to insurance companies are well known. Although the majority does not reach this legal issue, underlying its entire discussion is its acceptance of the notion that group marketing is the solution to the serious malpractice insurance problems. That may be a reasonable approach, but it does not follow that group marketing must be inevitably accompanied by an agreement to divide such markets. Aetna should have the opportunity to make a convincing showing that the realities of the insurance business support a conclusion that joint action with regard to geographic areas of coverage or types of insurance offered is of the same genre as joint action such as pooling of risks or joint underwriting which are concededly the business of insurance. Aetna may be able to show that because of the special characteristics of the medical malpractice insurance industry, division of markets for such insurance is necessitated by the same considerations that underlie granting an exemption for other joint action. Perhaps it can show that these are among the "activities of insurance companies (which) relate so closely to their status as reliable insurers that they too must be placed in the same class." SEC v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969).
 
 
 166
 It has not, however, made such a showing in this case. Furthermore, the district court did not analyze the legal issue as to the scope of "the business of insurance" along the approach required by the Royal Drug decision. Therefore, I would not affirm its conclusion that the alleged division of markets constitutes "the business of insurance" as a matter of law.
 
 B.
 
 167
 Because the majority treats the state regulation issue, albeit in another context, I believe it appropriate to comment on the district court's holding that the "State of New Jersey has effectively regulated the insurance business and has evidenced its intent to occupy the field to the fullest extent of the power granted by the McCarran-Ferguson Act." This holding was based on the court's finding that, "The provisions of N.J.S.A. 17:29B-4 generally, describing unfair methods of competition and unfair deceptive acts or practices and specifically the subparagraph (11) catch-all clause, attest to the intention of the state to fully exercise its McCarran authority."
 
 
 168
 The New Jersey statute referred to by the district court defines specific acts and practices in the business of insurance as unfair methods of competition and unfair and deceptive acts or practices. None of the enumerated acts relates to division of geographic markets or to division of the types of insurance offered by insurance companies. Subparagraph (11), to which the court specifically referred, provides that said enumeration "is not exclusive or restrictive or intended to limit the power of the commissioner or any court of review under the provisions of section 9 (N.J.Stat.Ann. § 17:29B-9 (West 1970)) of this act." Section 9 gives the insurance commissioner authority to file charges against any person engaged in the business of insurance who is engaging in any unfair method of competition or in any unfair or deceptive act or practice.
 
 
 169
 It is unclear whether the district court concluded that the alleged division of markets was an unfair method of competition which could be proscribed under section 4 or 9 of the New Jersey statute. There is some authority that such proscription by the state satisfies the requirement of state regulation under the McCarran-Ferguson Act. See, e. g., Dexter v. Equitable Life Assurance Society, 527 F.2d 233 (2d Cir. 1975); Crawford v. American Title Insurance Co., 518 F.2d 217 (5th Cir. 1975). As the district court recognized, the concept that there may be regulation by mere prohibition has been severely criticized. See, e. g., Crawford v. American Title Insurance Co., 518 F.2d 217, 220 (5th Cir. 1975) (Godbold, J., dissenting); Carlson, The Insurance Exemption from the Antitrust Laws, 57 Tex.L.Rev. 1127, 1150-1161 (1979).
 
 
 170
 As an initial matter, I believe that the record is totally inadequate to support the inference that market division of the type alleged here is clearly one of the activities prohibited by the New Jersey statute. Aetna has cited no New Jersey case to support that proposition. In addition, there is nothing in the record to indicate that the New Jersey insurance commissioner considers division of markets for malpractice insurance to be encompassed within those sections. Indeed, if survival of medical malpractice insurance in New Jersey mandates some joint action to divide the market so that there can be an adequate risk pool, then it would be inconsistent to view such a division of markets as an unfair trade practice prohibited by the New Jersey statute.
 
 
 171
 The congressional purpose in enacting the McCarran-Ferguson Act was to provide a limited exemption from the antitrust laws only to the extent of state regulation of the business of insurance. See 15 U.S.C. § 1012(b); Seasongood v. K & K Insurance Agency, 548 F.2d 729 (8th Cir. 1977). If Aetna had withdrawn completely from New Jersey as part of an agreement to divide the market for all insurance matters, it is doubtful that New Jersey would continue to have any regulatory authority over Aetna. Even were New Jersey to regulate the conditions of withdrawal by an insurance company, a matter not disclosed by this record, its subsequent and inevitable nonregulation of the absent company can hardly be deemed the type of state regulation contemplated by Congress in the McCarran-Ferguson exemption. As the Supreme Court stated in rejecting the claim that the McCarran-Ferguson Act precluded the Federal Trade Commission from regulating insurance advertising in interstate commerce:
 
 
 172
 (I)t is clear that Congress viewed state regulation of insurance solely in terms of regulation by the law of the State where occurred the activity sought to be regulated. There was no indication of any thought that a State could regulate activities carried on beyond its own borders.
 
 
 173
 FTC v. Travelers Health Ass'n, 362 U.S. 293, 300, 80 S.Ct. 717, 721, 4 L.Ed.2d 724 (1960). See also Seasongood v. K & K Insurance Agency, 548 F.2d 729 (8th Cir. 1977); American General Insurance Co. v. FTC, supra, 359 F.Supp. at 894-95.
 
 
 174
 With regard to the nature of state regulation which satisfies the McCarran-Ferguson Act, more affirmative regulation than a mere general prohibition of unfair trade practices may be required. See Sullivan & Wiley, supra, 27 U.C.L.A.L.Rev. at 288-291. As the Court commented in another context: "This is not a case where a State has decided that regulatory policy requires that certain categories of risks be allocated in a particular fashion among insurers, or where a State authorizes insurers to decline to insure particular risks because the continued provision of that insurance would undermine certain regulatory goals, such as the maintenance of insurer solvency." St. Paul, 438 U.S. at 554, 98 S.Ct. at 2936. The Court noted that "petitioners do not aver that state law or regulatory policy can be said to have required or authorized the concerted refusal to deal with St. Paul's customers." Id. (emphasis added).
 
 
 175
 Although the district court did not refer to any New Jersey law or policy other than the law proscribing unfair trade practices, there is in fact another relevant statute which may establish the predicate for a finding that New Jersey has determined to fully exercise its McCarran-Ferguson authority with respect to medical malpractice insurance. In 1975, the New Jersey legislature enacted a statute which created the New Jersey Medical Malpractice Association. In general, the statute requires all insurance companies writing liability insurance in New Jersey to join the Association and gives the Association the power to reinsure medical malpractice policies written by qualified providers and to issue such policies directly. The Association may exercise these powers only after the Commissioner of Insurance makes a determination that medical malpractice insurance is not readily available to state licensed physicians and health care facilities. N.J.Stat.Ann. §§ 17:30D-1-30D-16 (West Supp.1980). The record does not indicate whether such a determination has been made. The ramifications of this statute were not explored by the district court. Before the issue of state regulation can be decided, it would be necessary to consider whether this statute constitutes the type of aggressive state regulation which this court has previously found justifies a finding of state regulation. See Travelers Insurance Co. v. Blue Cross of Western Pennsylvania, 481 F.2d 80, 83 (3d Cir.), cert. denied, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973).
 
 III.
 
 176
 The issue actually before us is the propriety of the district court's grant of summary judgment on the basis of a legal conclusion that the alleged agreement to divide the market for medical malpractice insurance was exempt from the operation of the antitrust laws because of the McCarran-Ferguson Act. Before a court insulates such potentially anticompetitive arrangements from antitrust inquiry, the party seeking summary judgment must place before the court adequate information about the realities of the marketplace and the operation of the insurance business to support its proposed judgment. The tests applied by the Supreme Court in its two recent opinions interpreting the McCarran-Ferguson Act, St. Paul and Royal Drug, "are fact-specific rather than categorical in nature; both will usually require full factual development before they can be applied definitively." Sullivan & Wiley, supra, 27 U.C.L.A.L.Rev. at 288. I believe that the record fails to support the district court's conclusions that the alleged agreement to divide markets constitutes the business of insurance and that New Jersey has regulated this practice.
 
 
 
 [1]
 The "derivative" claim is that, "by reason of the said acts alleged and committed by the defendants against her husband, as set forth therein, and the false statements made by them concerning him, and the effects thereof upon her husband, she has suffered, and will suffer, embarrassment, humiliation and ridicule, great mental anguish and distress; that her companionship, comfort and happiness with him and in their living together and in their society, have been, and will be, impaired, and she has been, and will be, deprived thereof, as the natural and proximate result of the said acts of the defendants against her husband; and that such embarrassment and deprivation of the companionship and society of and with her husband and the effect upon her mental feelings will long continue, all to her great injury, suffering and damage." Amended Complaint, Count VIII. Since the Owens concede that this count must rise or fall with the antitrust claim, we have no occasion to consider whether, even if we were to reverse the dismissal of Counts I and II, the quoted allegations state a claim for relief under Section 4 of the Clayton Act, 15 U.S.C. § 15 (anyone injured "in his business or property ... may sue therefor ....")
 
 
 [2]
 Aetna has moved to dismiss the appeal on the ground that the notice of appeal was untimely filed. This motion must be denied. Aetna's claim of untimeliness hinges on its contention that the July 25, 1979 order granting summary judgment to Aetna was final and thus appealable at that time. However, a cross-claim by Aetna against the New Jersey Medical Society for contribution or indemnity remained outstanding until August 13, 1979. Thus, under Fed.R.Civ.P. 54(b), the July 25 order was a judgment as to "fewer than all of the claims or parties," and, absent certification, was not appealable until August 13, 1979 when Judge Fisher filed an additional order dismissing the action after noting that the outstanding cross-claim had been withdrawn. We recognize that as a practical matter Aetna's pending cross-claim for contribution/indemnity became groundless once Aetna's motion for summary judgment was granted. However, to read "practicalities" into the already plain language of Rule 54(b) would only foster uncertainty in an area of the law that must remain clear. In Knox v. United States Lines Co. v. T. Hogan Corp., 294 F.2d 354 (3d Cir. 1961), we considered whether an outstanding motion for a new trial by defendant for indemnity against a third party defendant, filed as a protective measure in the event the court granted plaintiff's motion for a new trial in the principal action, deprived us of appellate jurisdiction when the denial of plaintiff's motion for a new trial was appealed. Despite our realization that once judgment was entered for defendant the third-party claim for indemnity was groundless, we held that the outstanding motion rendered the judgment on plaintiff's motion unappealable and dismissed the appeal. Although in Knox the order was referred to as nonfinal, a more precise description of its status is final but not appealable. See Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 7-8, 100 S.Ct. 1460, 1464-1465, 64 L.Ed.2d 1 (1980). In any event, Owens was not remiss in waiting until all the pending claims were resolved before filing the notice of appeal
 
 
 [3]
 All defendants except the Aetna Defendants have been dismissed on the basis of a settlement with Owens the details of which do not appear of record
 
 
 [4]
 Until recently that was the course followed in New Jersey with respect to automobile liability insurance. See N.J.A.C. 11:3-1.6. Risks were classified, however, and disparities in rates were permitted based on such factors as age, sex, and place of residence. Recently the Commissioner adopted regulations eliminating those rate disparities, thus maximizing the universe of insureds. That action is challenged in a pending lawsuit brought by the Insurance Service Office, a rating bureau, and five independent insurance companies. See The Newark Star Ledger, May 27, 1981, § 1, at 1, col. 4-6
 
 
 [5]
 See, e. g., Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979); Consolidated Express Inc. v. New York Shipping Association, 602 F.2d 494, 513 n.17 (3d Cir. 1979)
 
 
 [6]
 Agreements regarding agents' commissions are not at issue in this case. Cf. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 224 n.32, 99 S.Ct. 1067, 1080 n.32, 59 L.Ed.2d 261 (1979)
 
 
 [7]
 The letter reads:
 Several years ago, an Aetna team was formed to study the Professional Liability situation and it was the conclusion and recommendation of this team that the only way to profitably approach Professional Liability business would be through the strong endorsement of a state medical society and the commitment of that medical society to a Loss Control & Education Program.
 Aetna is experimenting with the state medical society endorsement approach in eight states and although we are not prepared at this time to say that this is the answer, we are encouraged by the results.
 Many state medical societies have endorsed or sponsored other insurance carriers for Professional Liability insurance. Since we will not be writing this coverage, and if you have no other market, you are aware that the doctors can place their coverage through the society's sponsored carrier. This would be no different than coverages some insureds of yours have which are now placed through specialty markets but you are still able to retain the rest of the account.
 (JA 31).
 
 
 [8]
 Owens also finds support for his market division claim in the deposition testimony of Bruce Mahon, subpoenaed by defendants. Mahon gathered from conversations with Hansen, the Vice President of Aetna, that Aetna and other carriers had decided that the only way malpractice insurance could survive was
 for one carrier to be sponsored by the Medical Society, and they would take that and go out and somebody else in another State take another State. They could not compete and survive in the market.
 (JA 223-24). Mahon's observation is based, however, on vague, equivocal recollections of hearsay statements, which, by themselves, cannot justify putting these parties to the expense of a full-blown trial. At best, the deposition suggests only that certain unidentified major insurance companies were concerned about the malpractice problem and that they together, or Aetna alone, had discussed it with the New Jersey Commissioner of Insurance:
 Q Was there any statement by Mr. Hansen at the meeting that you attended in Hartford, Mr. Mahon, concerning when a meeting or discussion had taken place between him on the one hand and representatives of other insurance companies on the other hand concerning
 A If there were, I don't remember.
 Q What did he say, if anything, about the identity of the other insurance companies?
 A Well, he did mention them, but that was of little interest to me at the time. All I can remember is they liked four or five top malpractice writers because at that time there were not many people writing malpractice.
 Q Did he indicate there were any discussions with the Commissioner of Insurance?
 A He said they were discussions right at that time with the Commissioner of Insurance of New Jersey malpractice problems and about rates and prices, yes.
 Q And the fact that only one could survive?
 A With the Commissioner, you mean?
 Q Yes.
 A I don't know. That I don't remember. All I know is that they all had problems, and as an industry they felt the solution was either no business or you had to be exclusive in the market.
 (JA 226-27). Such testimony does not, alone, support an allegation that Aetna and Chubb engaged in a secret, naked agreement to divide markets, and, if anything, suggests that their response to the malpractice crisis proceeded through regulatory channels.
 
 
 [9]
 A subsidiary aspect of Owens' boycott claim is that Aetna and the Britton Agency conspired to print an article in the New Jersey Medical Society's newsletter disparaging Owens' attempts to form a competing physicians group, the A.P.E.D., through which to provide an alternative insurance plan. The article was allegedly for the purpose, and had the effect, of deterring Medical Society members from doing business with Owens. Appellant's Brief at 28. The record evidence relied upon fails, however, to link these publications to Aetna. The only meetings between Britton Agency and Aetna disclosed on the record were for unrelated, legitimate purposes. (JA 440)
 
 
 [10]
 Boycotts are generally characterized as a per se offense. See United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211-12, 79 S.Ct. 705, 708-709, 3 L.Ed.2d 741 (1959). On the other hand, a supplier may ordinarily grant an exclusive agency provided there is no purpose to create a monopoly, nor any unreasonable restraint of trade. Packard Motor Car Co. v. Webster Motor Car Co., 243 F.2d 418 (D.C.Cir.1957). If there is, an exclusive agency arguably might offend federal antitrust law in the absence of evidence that it had the consent of state regulators
 
 
 [1]
 "When I use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean neither more nor less."
 "The question is," said Alice, "whether you can make words mean so many different things."
 "The question is," said Humpty Dumpty, "which is to be master that's all."
 L. Carroll, Through the Looking Glass and What Alice Found There 124, reprinted in Journeys in Wonderland (Derrydale 1979). (emphasis in original).
 
 
 [2]
 Several courts of appeals have been careful to note that they will refrain from affirming the grant of summary judgment on a ground not relied upon by the district court unless the non-moving party has had fair opportunity to contest that ground before the appellate court. E. g., Charbonnages DeFrance v. Smith, 597 F.2d 406, 416 & n.9 (4th Cir. 1979); Paskaly v. Seale, 506 F.2d 1209, 1211 n.4 (9th Cir. 1974). See also Yale v. National Indemnity Co., 602 F.2d 642, 650 n.18 (4th Cir. 1979); Lee Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1307 (4th Cir. 1979)
 
 
 [3]
 The Table of Contents of Aetna's Memorandum in the District Court serves to summarize its claim. The relevant excerpt is as follows:
 IV. PLAINTIFF'S CLAIM IN COUNT ONE OF AN AGREEMENT TO DIVIDE MARKETS FOR INSURANCE CANNOT BE MAINTAINED AS A MATTER OF LAW
 A. Plaintiff's Claim of division of Markets is Barred by the McCarran-Ferguson Act
 
 
 [1]
 The challenged conduct involves "the business of insurance"
 
 
 [2]
 The challenged conduct is regulated by the State of New Jersey
 
 
 [3]
 Aetna's alleged action is not a "boycott" and therefore does not come within the exception to the McCarran-Ferguson exemption
 B. Plaintiff Lacks Standing to Bring an Antitrust Claim on Allegations of Market Division
 
 
 [1]
 Plaintiff is not within the "target area" of an agreement to divide markets
 
 
 [2]
 The incidental injury to plaintiff did not occur "by reason of" that which makes the alleged conduct (a division of markets) unlawful
 
 
 [3]
 The circumstances of plaintiff's business establish that any injury to him was remote and indirect
 
 
 [4]
 Among the materials supporting Owens' claim of a conspiracy to divide the markets is the deposition testimony of Bruce Mahon, President of the McCay Corporation. Mahon testified regarding a meeting between himself and several Aetna representatives, including Robert Hanson, the Vice President of Aetna:
 Q Was any mention made with respect to any other insurance carriers at that meeting?
 A Yes, it all got into a long discussion concerning malpractice and Bob Hanson said that really the only way there is no solution they could see to our problem because the only solution in malpractice would be to have the insurance companies for instance, when you have the State Medical Society, if they would insure them as a group, that is what one company like what's-its-name does in Jersey that handles the malpractice now.
 Q Yes?
 A I have a blank on it, but Aetna would say, take Hartford or they would take Texas and somebody would take another State, so that is the only way they could survive in a malpractice business by strictly having one carrier in each State.
 Q Did Mr. Hanson or Mr. Shipps or anyone else present at that meeting state that they had ever met with any other insurance company in order to discuss the New Jersey malpractice market?
 A Yes, they had met to discuss New Jersey, and I forget, a couple of other States that were having severe problems, too.
 Q Who said that?
 A Mr. Hanson.
 Q Did he say who he met with?
 A I am trying to think, and I will think in a minute of the company that handles New Jersey's Medical Association. Maybe you can help me with the name.
 Q Chubb & Son?
 A Correct, Chubb & Son.
 Q What did he say with respect to Chubb?
 A The answer would be Chubb would handle New Jersey because they already have the Medical Society as a group.
 Q Did he say there had been meetings between Aetna and Chubb with respect to that?
 A They had meetings with respect to malpractice.
 Q Chubb and Aetna, representatives of Chubb and Aetna?
 A Yes, and other major malpractice carriers.
 Q Do you recall if Mr. Hanson made any statements to the effect that a number of insurance companies had decided to "whack up" the market?
 A I think they had decided I don't know if I use those same words, but I think they decided that the only way you can do it is for one carrier to be sponsored by the Medical Society, and they would take that and go out and somebody else in another State take another State. They could not compete and survive in the market.
 (JA 221-224). In addition, the record contains an affidavit of Eugene J. Cudworth, a former employee of "The Hartford" group of insurance companies, which states that:
 principal insurers of physicians malpractice had decided and planned that the most profitable way of underwriting that line was to maximize state medical society group-sponsored business on a state-by-state basis. One designated carrier would provide the protection in a designated state such as Aetna in Connecticut or Chubb in New Jersey, etc. (emphasis added).
 (JA 61)
 Summary judgment is appropriate only when, after viewing the evidence in the light most favorable to the non-moving party, the court can conclude that "it is quite clear what the truth is, that no genuine issue remains for trial." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472-73, 82 S.Ct. 486, 490-491, 7 L.Ed.2d 458 (1962); Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). The courts have been particularly cautious in granting summary judgment in antitrust cases, such as the instant one, where "motive or intent play leading roles" and "proof is largely in the hands of the alleged conspirators." Poller, supra, 368 U.S. at 473, 82 S.Ct. at 491. See Larry V. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trade Council, 609 F.2d 1368 (3d Cir. 1979) (en banc). When the record in its present state is tested against this strict standard, it cannot be said that there is not a genuine dispute as to whether Aetna and Chubb entered into a conspiracy to divide markets.
 
 
 [5]
 It has been suggested that Congress may have overreacted to the South-Eastern Underwriters decision because a business' engagement in interstate commerce does not cripple the states' basic ability to tax and regulate. See Sullivan & Wiley, Recent Antitrust Developments: Defining the Scope of Exemptions, Expanding Coverage, and Refining the Rule of Reason, 27 U.C.L.A. L.Rev. 265, 270-72 (1979)
 
 
 [6]
 See generally, Carlson, The Insurance Exemption from the Antitrust Laws, 57 Texas L.Rev. 1127, 1128-39 (1979)
 
 
 [7]
 The dissent relied on the same legislative history to conclude that Congress deliberately chose to phrase the exemption broadly. Royal Drug, 440 U.S. at 234-35, 99 S.Ct. at 1084-1085. (Brennan J., dissenting). The major thrust of the dissent was its disagreement with the majority's holding that no provider agreement can be considered part of the "business of insurance." The dissent would have held that "(s)ome kind of provider agreement becomes a necessity if a service-benefits insurer is to meet its obligations to the insureds," id. at 246, 99 S.Ct. at 1090 (emphasis in original), and that the close nexus between the Pharmacy Agreements and both the rates and fiscal reliability of Blue Shield's plan warranted their inclusion within the "business of insurance." Id. at 250, 99 S.Ct. at 1092. As will be developed in the text, this difference between the majority and dissent is not relevant to the legal issue in this case
 
 
 [8]
 The other component of the industry writes life and health insurance. See generally U.S. Department of Justice, The Pricing and Marketing of Insurance (1977) (hereafter Dept. of Justice Study); National Commission for the Review of the Antitrust Laws and Procedures, Report to the President and the Attorney General 225-251 (1979) (hereafter Report to the President )
 
 
 [9]
 The information and risk problems faced by life and health insurance companies are apparently less severe than those of the property-liability companies. As a result, life-health insurers have generally not engaged in extensive cooperative activities, such as rating bureaus, but there is cooperation with respect to the formation of mortality tables. Report to the President, supra, at 228; Dept. of Justice Study, supra, at 277
 
 
 [10]
 Usually the syndicate issues a single policy on a risk in the name of all the members of the pool, with each member sharing in the premiums and losses on a predetermined basis. Liability of the participants may be either several or joint and several. Dept. of Justice Study, supra, at 210-213. Pooling or joint underwriting associations can also result from state legislation, intended to remedy perceived problems in either the availability or price of certain types of insurance. Illustrative are assigned risk plans under which insurers selling auto insurance in the state have been compelled to provide automobile insurance for high risk drivers unable to obtain insurance in the voluntary market. Hanson, supra, at 805. More recently, as a result of the medical malpractice insurance crises many states required all insurers writing liability insurance in the state to be a member of a joint underwriting association which would write malpractice insurance in the event it was no longer available on a voluntary basis. Id. at 805-06. Dept. of Justice Study, supra, at 210
 
 
 [11]
 The primary insurer (reinsured) may share the risk on a pro rata or "excess of loss" basis. Under the pro rata method, the reinsurer agrees to accept a fixed percentage of the gross writings of the reinsured. Under the "excess of loss" basis the reinsurer agrees to indemnify the reinsured for any losses in excess of some specified amount. A reinsurance arrangement differs from a placement in that in a placement there are separate contracts between the insured and insurer, while in a reinsurance arrangement the contract is between the primary insurer and the reinsurer. Dept. of Justice Study, supra, at 205-209
 
 
 [12]
 Sullivan and Wiley suggest that the need for price-fixing through rating bureaus may be overrated, and point to the action of sixteen states which "have replaced the older, cartel-protecting regulatory regimes with so-called 'open competition' laws that prohibit industry agreements to enforce bureau rates and give individual companies freedom to set their own prices." Sullivan & Wiley, supra, 27 U.C.L.A.L.Rev. at 272
 
 
 [13]
 See note 7 supra. Justice Brennan, dissenting in Royal Drug, contended that the "business of insurance" must be interpreted to connote not only risk underwriting but also contracts closely related thereto, which would include "agreements (which) themselves perform an important insurance function." 440 U.S. at 251, 99 S.Ct. at 1093. The majority appeared to have rejected this functional approach when it stated that "it does not follow that because an agreement is necessary to provide insurance, it is also the 'business of insurance.' " Id. at 213-14 n.9, 99 S.Ct. at 1074 n.9
 
 
 [14]
 The NAIC proposal provided:
 On and after July 1, 1948, the said Sherman Act shall not apply (1) to any agreement or concerted or cooperative action which prescribes the use of rates for insurance, insurance policy or bond forms or underwriting rules or plans if such rates, forms, rules, or plans are required, by the law of the State in which they are to be used, either to be approved by the supervisory official or agency of such State having authority with respect thereto, or to be filed subject to disapproval by such official or agency; (2) to the use of any such rates, forms, rules, or plans which have been so approved or filed; (3) to any cooperative or joint service, adjustment, investigation, or inspection agreement relating to insurance, or to acts under such agreements; (4) to any agreement or concerted or cooperative action among two or more insurers to insure, reinsure, or otherwise apportion the risks taken by the parties to such agreement or any of them, or to issue policies or bonds with joint or several liability; (5) to any agreement or concerted or cooperative action with respect to the payment of insurance agents' or brokers' commissions; (6) to any agreement or concerted or cooperative action with respect to the collection and use of statistics or with respect to policy or bond forms; or (7) to any agreement or concerted or cooperative action providing for the cooperative making of insurance rates, rules, or plans, if such agreement does not require the use of such rates, rules, or plans.
 
 
 [90]
 Cong.Rec. A4406 (1944)