**THIS OPINION
IS CITABLE AS
PRECEDENT OF
THE TTAB**

Hearing:
February 25, 2005[1]

Mailed:  October 21, 2005

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

First Niagara Insurance Brokers, Inc.
v.
First Niagara Financial Group, Inc.[2]
_____

Opposition Nos. 91122072, 91122224, 91122193, 91122450,
91122712, 91150237[3]
_____

George Gottlieb and Barbara Loewenthal of Gottlieb, Rackman
& Reisman for First Niagara Insurance Brokers, Inc.

Paul I. Perlman and David L. Principe of Hodgson Rush for
Niagara Bancorp.
_____

Before Sams, Walters and Walsh, Administrative Trademark
Judges.

Opinion by Walters, Administrative Trademark Judge:

_____

[1] The oral hearing, which was held in New York City during a Practising
Law Institute program, was held before Judges Sams and Walters, with the
oral consent of the parties' attorneys.  An audiotape of the hearing was
available to the third panel member herein, Judge Walsh.

[2] The heading has been changed to reflect applicant's change of name
from Niagara Bancorp, Inc.  The name change was executed on May 12,
2000, and was recorded at the USPTO on July 24, 2000.

[3] These six oppositions were consolidated by the Board's order of June
12, 2002, addressing the parties' stipulated motion to consolidate,
filed March 7, 2002.

First Niagara Insurance Brokers, Inc. filed its opposition to the applications of First Niagara Financial Group, Inc. listed below.

```
Application No. 75890902
Opposition No. 91122072
Mark:  FIRST NIAGARA
Services:
   IC 035: leasing of office equipment
   IC 036: banking services; insurance services,
     namely, insurance brokerage, insurance
     agencies, insurance administration and
     insurance consultation, in the fields of
     life, property and casualty, accident, health
     and other insurance; credit insurance
     services; financial services, namely,
     financial and investment consulting,
     management and advisory services; investment
     and securities brokerage services; providing
     information on investment and securities
     performance; annuities services; charitable
     fund raising services
   IC 037: leasing of construction equipment and
     building machinery
   IC 039: leasing of motor vehicles
Filing Date:  January 7, 2000
Basis:  1b
Disclaimer:  FIRST
```

```
Application No. 75891547
Opposition No. 91122224
Mark: FIRST NIAGARA FINANCIAL GROUP
Services:
   IC 035: leasing of office equipment
   IC 036: banking services; insurance services,
     namely, insurance brokerage, insurance
     agencies, insurance administration and
     insurance consultation, in the fields of
     life, property and casualty, accident, health
     and other insurance; credit insurance
     services; financial services, namely,
     financial and investment consulting,
     management and advisory services; investment
     and securities brokerage services; providing
     information on investment and securities
     performance; annuities services; charitable
     fund raising services
```

    IC 037: leasing of construction equipment and
      building machinery
    IC 039: leasing of motor vehicles
Filing Date:  January 7, 2000
Basis:  1b
Disclaimer:  FIRST and FINANCIAL GROUP


Application No. 75890903
Opposition No. 91122193
Mark:



Services:
    IC 035: leasing of office equipment
    IC 036: banking services; insurance services,
      namely, insurance brokerage, insurance agencies,
      insurance administration and insurance
      consultation, in the fields of life, property and
      casualty, accident, health and other insurance;
      credit insurance services; financial services,
      namely, financial and investment consulting,
      management and advisory services; investment and
      securities brokerage services; providing
      information on investment and securities
      performance; annuities services; charitable fund
      raising services
    IC 037: leasing of construction equipment and
      building machinery
    IC 039: leasing of motor vehicles
Filing Date:  January 7, 2000
Basis:  1b
Disclaimer:  FIRST


Application No. 76004229
Opposition No. 91122450
Mark:  FIRST NIAGARA ONLINE
Services:
    IC 036: banking services, namely, providing
      electronic banking services to customers via
      a global computer network
Filing Date:  March 20, 2000
Basis:  1b

3

Opposition Nos. 91122072, 91122224, 91122193, 91122450, 91122712, 91150237

Disclaimer:  ONLINE


Application No. 76029614
Opposition No. 91122712
Mark:  FIRST NIAGARA BANK'S CUSTOMER CONNECTION LINE
Services:
   IC 036: retail banking services
Filing Date:  April 18, 2000
Basis:  1b
Disclaimer:  BANK'S and LINE


Application No. 76005479
Opposition No. 91150237
Mark:  FIRST NIAGARA E-CD
Services:
   IC 036: banking services, namely, providing
      electronic banking services to customers via a
      global computer network
Filing Date:  March 20, 2000
Basis:  1b
Disclaimer:  E-CD

As grounds for opposition, opposer asserts that applicant's marks, when applied to applicant's services, so resemble opposer's previously used marks FIRST NIAGARA and FIRST NIAGARA INSURANCE BROKERS, in standard character format, and FIRST NIAGARA INSURANCE BROKER'S INC., in the design format shown below, for "insurance brokerage services and other financial services" (notice of opposition, paragraph no. 1) as to be likely to cause confusion, under Section 2(d) of the Trademark Act.



Opposition Nos. 91122072, 91122224, 91122193, 91122450, 91122712, 91150237

Applicant, in each of its answers, denies the salient allegations of the claim and asserts as an affirmative defense that "opposer has not 'used' FIRST NIAGARA, FIRST NIAGARA INSURANCE BROKERS, FIRST NIAGARA INSURANCE BROKERS, INC. & design or FIRST NIAGARA INSURANCE BROKERS, INC. in commerce as that term is used in 15 U.S.C. §1127 or related statutes and common law" (answer, paragraph 10). In Opposition No. 91122072 only, pertaining to the standard character mark FIRST NIAGARA, applicant admitted that "to the extent that opposer uses FIRST NIAGARA as a trademark, FIRST NIAGARA is identical to" the mark FIRST NIAGARA that applicant seeks to register.

*The Record*

The record consists of the pleadings; the files of the involved applications; and both parties have made evidence of record by notices of reliance and testimonial depositions, with accompanying exhibits. Both parties filed briefs on the case[4] and an oral hearing was held.

*Opposer*

Based on the evidence of record, we make the following findings of fact with respect to opposer. Opposer is a

---

[4] Both parties filed consented motions to submit briefs that exceeded the page limits set forth in 37 CFR §2.128(b), arguing that it is warranted by the size of the record and the number of proceedings consolidated. These motions were granted by the Board due to the compelling circumstances of this consolidated proceeding. We hasten to point out that the instances in which the Board will grant such motions, whether or not consented to by the other party, are extremely limited.

5

Canadian insurance brokerage agency[5] with offices, employees and assets in two locations in Ontario, Canada: Niagara Falls and Niagara-on-the-Lake. Opposer adopted its present name in 1984 and has used it continuously from that date as a mark in connection with its insurance services.[6] Opposer is licensed in Ontario and acknowledges that "it initiates all of its brokerage services in Canada" (reply brief, p. 8); and that it is not licensed in any state in the United States, any other province in Canada, or any other country to provide insurance brokerage services. Opposer has no property, offices or employees in the United States, nor does it pay any United States or individual state taxes.

Opposer operates a website that includes information about its history, business and employees. An Internet user cannot purchase insurance, make payments on a policy, or access information about a specific account through this website. An Internet user can click on a broker's name on the website to bring up an email screen to send an email to that broker. Opposer's web address is firstniagara.com, whereas applicant's web address is first-niagara.com.

---

[5] To a lesser extent, opposer also offers financial services in the form of insurance premium payment plans, segregated funds and annuities.

[6] In 1973, one of opposer's present principals, Mr. Wayne Arthur "Bart" Maves, purchased the business, operating since 1886, and, as noted, changed the name in 1984 to First Niagara Insurance Brokers Inc.

6

Opposer received, at the time of trial, approximately six to ten e-mails per day intended for applicant.[7]

Opposer brokers insurance that is actually issued by underwriting companies.  The types of insurance opposer brokers include commercial insurance, municipal insurance, athletic bonus insurance, home insurance, boat/yacht insurance, life insurance, broadcast liability insurance, as well as travel, health travel, and travel insurance for individuals living in Canada for travel both within and outside of Canada, including to the United States.[8] Processing claims for these policies is a large part of opposer's business.  Claims processed may involve incidents occurring in the United States or incidents involving U.S. citizens in Canada.

Most of opposer's clients are Canadian individuals or companies and its policies cover real property located in Canada and personal or commercial property registered or located in Canada or in transit.  One of opposer's principals, Michael Maves, stated that opposer also has clients in the United States, United Kingdom, Azores,

---

[7] Applicant contacted opposer soon after opposer obtained its web address in 2000 and several times thereafter in an attempt to purchase the web address from opposer.

[8] By Canadian law or regulation, opposer's health travel insurance may be issued only to Canadian residents who are covered by Canadian provincial medical insurance; further, to obtain an annual travel health policy, the insured must reside in Canada for a prescribed period of time.  Opposer issues between thirty and seventy travel health policies per year.

Luxembourg, Germany, Japan and Australia; however, there is no evidence as to whether these clients are Canadians or the nature of the clients' business or insurance with opposer. Opposer has provided evidence of several situations where Canadian insurance coverage extends to incidents in, or otherwise involves, the United States, which are noted below.[9]  The underwriters used by opposer include Canadian, U.S., and/or international companies, often through Canadian branch offices.

Opposer provided testimony and evidence about the insurance policies of several of its commercial and individual clients.  Some of this evidence pertains to policies issued many years ago.  However, the testimony of Bart and Michael Maves confirms that many of these policies have been renewed continuously to the time of the respective depositions.

Opposer works with several U.S. brokerage agencies, which are not licensed in Canada, that have U.S. clients with property located in Canada.  The U.S. broker contacts opposer, who puts together an insurance proposal from an underwriter and sends it to the U.S. broker.  The U.S.

---

[9] Opposer provided specific evidence about Mr. Bart Maves' involvement in a fraternal organization, the Kentucky Colonels, with headquarters in Kentucky.  Clearly, this is irrelevant to opposer's business except to the extent that opposer issued travel or other liability insurance to the local Ontario chapter of this organization.  Also, evidence of Mr. Bart Maves' personal involvement in and sponsorship of a golf tournament in the United States is not relevant to the issue of whether opposer's services are rendered in commerce.

broker will review the policy with its client and obtain required signatures.  It appears from the record that opposer will share its commission with the U.S. broker, but it is not clear under what circumstances.  To obtain liability insurance for its Canadian travel and tour business clients that take tourists to the United States, opposer works with a U.S. insurance brokerage agency that is authorized by the National Tourism Association, an organization located in the United States, to broker liability policies to its members.

Opposer has brokered life insurance policies to a few Canadian residents in Canada who subsequently moved to various states within the United States and maintained their Canadian life insurance policies.  Opposer has brokered homeowners insurance for individuals living in various states within the United States,[10] for property located in Ontario, Canada.  The individual client files submitted as exhibits and the testimony of Mr. Michael Maves show that, with respect to a client's insured Canadian property, in some cases opposer or the client in the United States directed their correspondence through U.S. brokers in geographic proximity to the client in the United States;

---

[10] Several of the individuals so insured originally lived at the insured Canadian property addresses when they obtained the insurance and subsequently moved to the United States, but retained the Canadian properties for rental or vacation use.

whereas in other cases it appears that opposer communicated directly with its client in the United States.

Opposer has brokered "contingency" or "athletic bonus" insurance for Bell Canada, a Canadian company, in connection with its endorsement contract with a golfer, Michael Weir, on the PGA Tour, although opposer noted that such "insurance" is more a financial product than an insurance product. Opposer obtained proposals from underwriters and financial companies in the United States, Canada and the United Kingdom, and Bell Canada chose a policy from SCA Promotions, a Texas company.

Opposer brokers both individual and commercial Canadian auto insurance policies on vehicles registered in Ontario, Canada; however, such insurance covers incidents involving the insured vehicles that occur in either Canada or the United States and may include a rider extending coverage to a client's rental of cars in the United States and Canada. The Province of Ontario regulates the coverage required by auto policies.[11]

Similarly, opposer brokers boat/yacht insurance policies. Most of the policies in the record are riders on homeowner policies relating to Canadian property, while a few are independent yacht policies. The record includes

---

[11] If, in addition to commercial vehicle coverage for Ontario, a business will be transporting goods into the United States, Mr. Michael Maves stated that opposer will broker a second policy through a U.S. underwriter for the travel in the United States.

10

copies of such policies issued to clients with addresses in the United States. It is clear that at least some of the insured boats/yachts are docked or stored in Canada. Coverage extends to incidents involving, in most cases, the boats or yachts on land or in the water in the territory defined as "inland lakes and streams in North America" (M. Maves Deposition, p. 391), which is limited by definition in the policies to the United States and Canada.

Opposer brokers approximately 300 commercial liability policies annually, which usually pertain to buildings and their contents at specified locations. However, such policies often contain riders covering, for example, goods in transit. These policies generally extend coverage to incidents arising while the goods are in transit in the United States. For example, opposer submitted evidence of a Canadian manufacturer, Automation Devices, for whom it has brokered commercial general liability and auto liability policies. Automation Devices designs, builds and installs assembly lines for large factories. Automation Devices has manufactured and installed equipment for U.S. companies. In such a case, it sends its own workers to the site in the United States to install the machinery. Automation Devices' insurance covers liability arising from this work; however, opposer has had to change underwriters for Automation Devices at least once due to the underwriter's unwillingness

11

to underwrite Automation Devices' "U.S. exposure."[12] (Opposer's Exhibit 21G.)

Another example wherein opposer has brokered commercial liability insurance that extends to incidents occurring in the United States involves Stewart Deliveries, a Canadian delivery service whose trucks and drivers deliver materials and commercial shipments to southern Ontario and to several states in the United States. Stewart Deliveries' trucks carry certificates of insurance as required of common carriers traveling through states in the United States, and, upon a client's request, opposer has faxed copies of such certificates to, for example, the New Jersey Bureau of Motor Carriers, for their records. An example of a claim administered by opposer involved one of Stewart Deliveries' trucks hitting and damaging a barrier on the New York State Thruway in December 2001. The New York authority presented its damage claim to Stewart Deliveries, who forwarded it to opposer. Opposer forwarded the claim to the underwriter, who dealt directly with the New York authority to settle the claim.

Opposer has brokered a general commercial liability policy, with coverage for goods shipped in transit and stored off premises in Canada, for Dewgooders WeatherWear

---

[12] Mr. Michael Maves stated that this was the result of post-9/11/01 changes and the new underwriter is Cross Border Underwriting Services in Canada.

Inc., a Canadian manufacturer of leisure outerwear and waterproof rainwear. This coverage extends to finished goods in transit to the United States.

Opposer has also brokered a general commercial liability policy for the Niagara Historical Museum, in Canada, including a fine arts rider to cover a special exhibit from the United Kingdom and transit of the exhibit to its next stop in South Carolina.

Opposer has brokered insurance from Canadian underwriters for Canadian municipalities, including Niagara Falls and Niagara-on-the-Lake, both located in Ontario. This insurance includes coverage for injuries and other damage incurred by tourists, including those from the United States, while visiting these municipalities.

The Niagara Falls Bridge Commission ("NFBC")[13] owns and operates three bridges between the United States and Canada. These bridges also have businesses located on their

---

[13] The Niagara Falls Bridge Commission was created in 1938 under a joint resolution of the U.S. Congress, with corresponding legislation in Canada. As amended, the U.S. law authorizes the Niagara Falls Bridge Commission to build, maintain and operate bridges between the United States and Canada, with each bridge being in part in the United States and in part in Canada; and to charge tolls and issue bonds in connection therewith. The law provides that, for the purpose of exemption from taxes, "[t]he bridge constructed under the authority of this joint resolution shall be deemed to be an instrumentality for international commerce authorized by the Government of the United States" (Section 4). A recent amendment to Section 6 of the Joint Resolution states: "(c) TREATMENT OF COMMISSION – the Commission shall be deemed for purposes of all Federal law to be a public agency or public authority of the State of New York, notwithstanding any other provision of law." The Commission consists of four members appointed by the Governor of New York and four members appointed by the Canadian government or the government of Ontario.

premises. Opposer has issued commercial liability insurance to businesses leasing this space. Additionally, opposer has brokered a general commercial liability and auto liability policy for the Indian Defense League of America, an organization with a Canadian address, in connection with an annual parade starting on one of the bridges operated by the NFBC between the United States and Canada. The parade begins in the middle of the bridge and continues into Canada, ending at a park.

Wayne Arthur "Bart" Maves, opposer's founder, stated that in 1973 opposer's gross premiums were approximately $728,000; that today its gross premiums are approximately $7,250,000; and that opposer's annual advertising budget is approximately $30,000, all in Canadian dollars. Opposer advertises its services by word-of-mouth; in Internet phone directories; in several local Ontario papers in Niagara and Niagara-on-the-Lake; by advertising on a local Ontario radio station that may be heard in the nearby United States; by sponsoring local Ontario sports teams, some of whom play games in the United States; and by distributing, in opposer's local Ontario area, various promotional items with opposer's marks upon them.

*Applicant*

Based on the evidence of record, we make the following findings of fact with respect to applicant. Applicant's

14

business includes banking, investment and related services and, of most relevance herein, applicant is an insurance brokerage agency licensed to do business as a resident in New York State and as a non-resident in forty-five other states. Applicant has never had offices in Canada. Applicant's insurance business is located in Northpointe, New York; and applicant, in the past, has had offices in Buffalo and Niagara Falls, New York, as well as several other towns in western New York State. In January 1999, applicant was acquired by Lockport Savings Bank; in November 2002, applicant changed its name from Warren Hoffman Associates, Inc. to First Niagara Risk Management, Inc., for which it obtained approval from the New York Department of Insurance.

Applicant is licensed by the New York Department of Insurance, a state government agency, to offer insurance brokerage services in New York. The New York Department of Insurance specifies the types of insurance applicant is authorized to sell; requires annual license renewal for a fee; and requires continuing education of license holders. Applicant does not presently hold a non-resident license to sell insurance in Ontario, Canada.

Applicant offers its insurance services primarily in western New York state and the types of insurance it brokers include the following: commercial property and casualty,

15

surety, employee benefits, life, accident and health (personal and commercial), personal property and casualty, including homeowners, auto, personal umbrella, watercraft, and other recreational vehicles, and annuities. Applicant admits that it has sold yacht insurance for yachts registered in New York or another state, but not for yachts registered in Canada, and that the yachts it insures may be docked in either the United States or Canada. Additionally, applicant admits that it has sold life and personal property insurance policies to individuals who are residents, *at the time of the policy sale*, of New York or another state, but not to individuals who are residents *only* of Canada.

Applicant has sold real property insurance to residents of Canada for property located in New York or another state, but not for property located in Canada. (Response to Opposer's First Request for Admissions.) If a New York resident policyholder changes his or her residence to Canada, the policy, for example, life insurance, remains valid and applicant communicates with the policyholder in Canada. (Applicant's Response to Opposer's First Set of Interrogatories.) Applicant admits that it offers these services to persons resident outside of New York or in Canada, but only in cooperation with insurance agents from the respective state or Canada. Applicant also offers financial services.

16

When applicant's non-commercial U.S. customers want insurance for a Canadian risk, such as a property located in Canada, applicant refers them to a Canadian broker, who writes the policy. Applicant does not write such policies because there would be a premium tax to the customer if the policy is not written by a Canadian insurance agency and, further, applicant is not expert in Canadian insurance.

Applicant's witness, John Hoffman, one of applicant's principals, stated that while it is rare, if circumstances arose whereby a Canadian citizen sought to purchase a life insurance policy from applicant, the customer would be required to, at least, apply for and accept delivery of the policy in New York state and pay the premium in New York State in U.S. funds.

Mr. Hoffman confirmed that its various individual personal, as well as corporate commercial, insurance policies cover incidents occurring in either the United States or Canada. In the few instances where applicant has insured its U.S. commercial clients for projects or manufacturing that have taken place in Canada, applicant has used a Canadian broker and a Canadian underwriter, and has not accepted a commission for the policy. Applicant could only accept such a commission if it had a non-resident license in Ontario, which it has not had for many years.

17

Applicant belongs to a professional insurance organization, Intersure, with approximately thirty members in the United States, Canada and the United Kingdom, each representing a specific geographic area. The organization provides professional education and the members avail themselves of the assistance and advice of other members regarding insurance practice in different geographic areas.

Both applicant's Mr. Hoffman and opposer's Mr. Bart Maves acknowledge that they met before this proceeding on several occasions as part of various groups at golf clubs; and that they each knew the other was involved in the insurance business, although Mr. Hoffman stated that he did not previously know the name of Mr. Maves' business. Applicant admitted, in its Response to Opposer's First Request for Admissions, that it knew of opposer's Internet domain name, firstniagara.com, at the time it adopted its domain name, first-niagara.com. The record shows that, from the time applicant changed its name to First Niagara, opposer began receiving emails that were intended for applicant; although Mr. Hoffman stated that applicant never received emails intended for opposer. Applicant contacted opposer seeking to purchase opposer's domain name, but opposer declined to sell it.

Opposer acknowledges that it advertises in printed periodicals and on radio stations in Canada; applicant

18

acknowledges that it advertises in the same media in New York; and both parties acknowledge that, given their proximity to the United States/Canadian border, and their proximity to each other, each of their respective advertising likely spills over into the other's country and business area.

*New York State Insurance Law*

Opposer offered the trial deposition of Michael Giordano, an attorney at the law firm of LeBoeuf Lamb in New York City, as expert testimony on the subject of insurance regulatory law.[14] Mr. Giordano stated that any person or entity acting as an insurance broker in New York State must be licensed by the New York Department of Insurance. Mr. Giordano stated that, based on this record and his familiarity with New York state insurance law, opposer is not licensed as either a resident or non-resident broker under New York insurance law; opposer's activities are not in violation of New York insurance law; and opposer has not acted as an insurance broker in New York.

The excerpts submitted by applicant from the laws of the State of New York, Chapter 28, Insurance Law, make the following points clear, broadly speaking:

---

[14] While applicant's attorney objected to Mr. Giordano's being accepted as an expert witness during the deposition, the objection was not renewed in applicant's brief. In fact, in its brief applicant referred to Mr. Giordano as "opposer's own insurance law expert." Therefore, any objection is deemed to have been waived.

19

- Insurance brokerage services of the type rendered by the parties in this case would be considered "doing an insurance business" (Article 11, Sec. 1101(b)(1));

- "Doing an insurance business" in the state of New York requires licensure by the state insurance licensing authority (*id.*, Sec. 1102(a));

- If, at the time an insurance policy properly issued outside the state, such policy covered subjects of insurance or risk not resident or located in the state, then subsequent "acts or transactions [regarding such policies] … shall not constitute doing an insurance business in this state" (*i.e.*, the broker's actions shall not require licensure) (*id.*, Sec. 1101(b)(2)(D)); and

- "Transactions with respect to policies of insurance on risks located or resident within or without this state … which policies are principally negotiated, issued and delivered without this state in a jurisdiction in which the insurer is authorized to do an insurance business" shall not constitute doing an insurance business in the state (*id.*, Sec. 1101(b)(2)(E)).

The law includes specific prohibitions against doing an insurance business in the state by a person or entity not licensed by New York state (including persons or businesses so licensed in another state or country but not in New

20

York); and provides specific jurisdiction in New York state with provisions for service of process in actions against unlicensed (in New York) persons or entities for claims involving business conducted within the state. For licensure, the law requires approval by the New York Department of Insurance of the name under which a licensed brokerage will do business. The law prohibits the licensure of any broker "proposing to do business under a name identical with, or so similar to as to be likely to deceive or mislead the public, the name of any insurer then licensed or authorized to do any kind of insurance business within this state, or of any proposed domestic insurance corporation" (*id.*, Sec. 1102(g)(1)).

*Analysis*

Opposer, as plaintiff in this proceeding, has the burden of establishing by a preponderance of the evidence that it is the owner of the pleaded marks and that it has priority such that it can prevail on its likelihood of confusion claim. *Sanyo Watch Co. v. Sanyo Electric Co., Ltd.*, 691 F.2d 1019, 215 USPQ 833, 834 (Fed. Cir. 1982). That is, likelihood of confusion cannot be recognized where one claimed to be aggrieved by that confusion does not have a right superior to the opponent's right. *Otto Roth & Co., Inc. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40 (CCPA 1981); and *BellSouth Corp. v. Planum Technology Corp.*,

14 USPQ2d 1555 (TTAB 1988).

Opposer did not plead or establish ownership of a federal trademark registration for its asserted marks. Applicant contends that opposer, a Canadian insurance brokerage company, has not established any use of its mark in connection with services rendered in commerce lawfully regulated by Congress, as required under Section 45 of the Trademark Act, 15 U.S.C. §1127. Applicant argues that opposer has no offices in the United States; that it has no state licenses to conduct insurance brokerage services in any state in the United States; and that the facts are insufficient to support a conclusion that opposer has used its marks in connection with its services in commerce in or with the United States.

Opposer contends that its services "carried out within the various states and between the United States and Canada, by the mails, telephone, fax and internet, are in both interstate commerce and foreign commerce with the United States [and] are thus rendered in commerce that Congress may regulate" (brief, p. 3). Opposer argues that the insurance policies that it places, the negotiating and settling of claims related to covered activities, and engaging the services of U.S. brokers "all profoundly affect commerce both within the United States as well as commerce between Canada and the United States" (brief, p. 32).

Clearly, opposer's claim of prior use can succeed only if it has proveduse of its marks in connection with services rendered in commerce lawfully regulated by Congress, as required under Section 45 of the Trademark Act, 15 U.S.C. §1127.[15]

We begin by noting that there is nothing in this record upon which we can base a conclusion that, as applicant contends, opposer has violated New York state law and, therefore, that any services opposer may have rendered in commerce were "unlawful." Moreover, the Board will not delve further into the insurance law and relevant precedent of New York State to determine whether, as applicant contends, any actions by opposer violate such provisions of law so as to constitute "unlawful commerce." Any specific concerns applicant has in this regard should be brought before the proper New York State authority.

There is no evidence or quoted provision of law in this record that contradicts the aforementioned conclusions stated by opposer's insurance law expert, Mr. Giordano, which applicant does not contest. Therefore, we begin our analysis with the findings that opposer is not licensed as either a resident or non-resident broker under New York insurance law or any other state law (which opposer

---

[15] An opposer claiming priority under Section 2(d) may rely on use that is strictly intrastate and not regulable by Congress, but opposer here is not relying on intrastate use.

acknowledges), and opposer has not acted as an insurance broker in New York or in any other state in the United States. However, we do not, as applicant would urge us to do, end our inquiry here. State insurance law is relevant to the question of opposer's rendering of services in commerce, but it is far from determinative of federal trademark rights. We must consider all of the relevant facts and law to determine whether opposer has established that it renders insurance brokerage services under its pleaded marks in commerce regulable by Congress.

Section 45 of the Trademark Act (15 U.S.C. §1127) includes the following definitions of "commerce" and "use in commerce":

> *Commerce*. The word "commerce" means all commerce which may lawfully be regulated by Congress.
>
> *Use in commerce.* The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this Act, a mark shall be deemed to be in use in commerce—
>
> . . .
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

"Commerce" under the Trademark Act is coterminous with that commerce that Congress may regulate under the Commerce

Clause of the United States Constitution.[16] *International Bancorp, L.L.C. v. Societe des Bains de Met et du Cercie des Etrangers Monaco*, 329 F.3d 359, 66 USPQ2d 1705 (4th Cir. 2003). See also, *United We Stand America, Inc.* v. *United We Stand, America, NY, Inc.*, 128 F.3d 86, 92-93, 44 USPQ2d 1351 (2nd Cir. 1997); and *Planetary Motion* v. *Techsplosion*, 261 F.3d 1188, 1194, 59 USPQ2d 1894 (11th Cir. 2001). The case before us is analogous to the case of *Buti Fashion World Company v. Impressa Perosa S.R.L.,* 139 F.3d 98, 45 USPQ2d 1985 (2nd Cir. 1998), wherein the Court stated the following about the scope of "commerce" as defined by the Trademark Act:

> In the trademark context, the limits of Congress's Commerce Clause authority are manifested by the cases that define the extraterritorial reach of the Lanham Act. . . . [W]e are concerned here not with the extraterritorial force of our trademark laws to regulate or redress the conduct of a foreign citizen in a foreign land, but with the ability of that foreign citizen to gain the protection of our trademark laws, and the degree of interaction with our nation's commerce that is required of him to receive that protection.

It is well established that prior use of a mark in a foreign country does not entitle its owner to claim exclusive rights in the United States as against one who used a similar mark in the United States prior to entry of the foreigner into the United States market. *Person's Co.*

---

[16] "The Congress shall have Power ... to regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes[.]" *U.S. Const.* art. I, §8, cl. 3.

*Ltd. v. Christman*, 900 F.2d 1565, 14 USPQ2d 1477, 1480 (Fed. Cir. 1990).  Thus, opposer's insurance brokerage services rendered under its mark in Canada are clearly insufficient to establish use of the mark in connection with services rendered in commerce under the Trademark Act.

Similarly, advertising and promotion of a mark in connection with goods or services marketed in a foreign country (whether the advertising occurs inside or outside the United States) creates no priority rights in said mark in the United States as against one who, in good faith, has adopted the same or similar mark for the same or similar goods or services in the United States prior to the foreigner's first use of the mark on goods or services sold and/or offered in the United States, at least unless it can be shown that the foreign party's mark was, at the time of the adoption and first use of a similar mark by the first user in the United States, a "famous" mark.  *Mother's Restaurants Inc. v. Mother's Other Kitchen, Inc*., 218 USPQ 1046, 1048 (TTAB 1983).  *See also Linville v. Rivard*, 41 USPQ2d 1731 (TTAB 1996), aff'd, 133 F.3d 1446, 45 USPQ2d 1374 (Fed. Cir. 1998); *Buti Fashion World Company v. Impressa Perosa S.R.L.*, *supra*; *All English Lawn Tennis Club (Wimbledon) Ltd. v. Creations Aromatiques, Inc*., 220 USPQ 1069 (TTAB 1983); and *Vaudable v. Montmartre, Inc*., 123 USPQ 357 (NY Sup. Ct. 1959).

Opposer does not rely solely on advertising and promotion in the United States. Further, opposer's advertising is clearly directed to Canadian purchasers. Any spillover advertising is minimal and insufficient to establish that opposer renders its services in commerce under its marks. To the extent opposer is arguing that applicant acted in bad faith in adopting its mark, applicant's prior knowledge of the existence of opposer's marks is not, in itself, sufficient to constitute bad faith. *See Action Temporary Services Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307 (Fed. Cir. 1989). Knowledge of a foreign use does not preclude good faith adoption and use in the United States. *Person's Co. Ltd. v. Christman*, *supra*. A finding of bad faith is warranted where (1) the foreign mark is famous in the United States or (2) the use is a nominal one made solely to block the prior foreign user's planned expansion into the United States. There is no evidence that opposer's mark is known in the United States by more than a few brokers and a handful of former Ontario residents and current Ontario landowners. Moreover, any such knowledge is incidental to opposer's rendering of its Canadian-based insurance brokerage services.

There is also no evidence that applicant intentionally sought to trade on opposer's good will or reputation. While there is evidence that the parties' principals were

acquainted through golf outings and tournaments and Mr. Bart Maves and Mr. Hoffman each knew the other was in the insurance business, there is no evidence to belie Mr. Hoffman's statement that he did not know the name of Mr. Maves' business.  Applicant learned of opposer's Internet domain name registration when it adopted its mark and sought to register it as a domain name and, thus, presumably learned the name of opposer's business and the nature of its services at that time.  But there is no evidence in the record that applicant had any reason to believe that opposer used its name as a mark in connection with insurance brokerage services rendered in commerce in or with the United States.  None of the circumstances for establishing bad faith adoption by applicant is present based on the facts in this case.

We consider now whether opposer's actions, as described herein and taken as a whole, constitute use of its marks in connection with insurance brokerage services rendered in commerce, in this case either interstate commerce or foreign commerce between the United States and Canada.

Because opposer cites the Supreme Court decision of *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), in support of its statement that "the insurance business is one that squarely falls within the Commerce Clause" (brief, p. 47), we begin by noting that

28

Congressional passage of the McCarran-Ferguson Act (15 U.S.C. §§1011 to 1015) was prompted by the *South-Eastern Underwriters* decision. While not disputing Congress' inherent power under the Commerce Clause to regulate the business of insurance, the Act expressly grants to the states the power to regulate the insurance industry.[17] See *Owens v. Aetna Life & Casualty Co.,* 654 F.2d 218, 224-226 (3rd Cir. 1981).

In *Aetna*, *supra*, the Court specified certain activities that were to be considered "the business of insurance" and, thus, subject to state regulation, including "authorizing agents to solicit individual or group policies" and "accepting or rejecting coverages tendered by brokers." See also *SEC v. Variable Annuity Life Insurance Co.*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); *Anglin v. Blue Shield of Virginia*, 693 F.2d 315 (4th Cir. 1982); and 43 *Am Jur 2d* §30.

---

[17] Section 2(b) of the McCarran-Ferguson Act provides:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax on that business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

There is no precedent that concludes that the McCarran-Ferguson Act limits, or otherwise affects, the applicability of the federal Trademark Act to the business of insurance; or that it prohibits entities properly engaged in the business of insurance under the laws of the appropriate state or states from obtaining federal trademark protection or availing themselves of the rights and remedies provided under the federal Trademark Act. It is, however, relevant, given the express power of the States to regulate the business of insurance, that the cases interpreting the McCarran-Ferguson Act specifically include brokerage-type services as part of the "business of insurance" covered by that Act and reserved to the states by law. Consistent therewith, we note, for example, New York state insurance law, which reiterates that brokerage services are part of the "business of insurance."

As previously noted, to render insurance brokerage services in the United States, one must be licensed in the state in which such services are to be rendered. As opposer admits, it has no state license to conduct insurance brokerage services in any state in the United States, nor has opposer provided evidence that it has rendered brokerage services in the "business of insurance" under the laws of

any state in the United States.[18]  Rather, opposer is
licensed in Ontario, Canada, conducts its insurance
brokerage services under its marks in Ontario, and its
services are regulated by Ontario law.  The nexus of its
services is Ontario and the activities opposer undertakes in
communicating with U.S. brokers and clients are simply a
necessary part of its Canadian business.

The activities with any connection to the United States
that opposer has established in this record are *de minimis*
and merely incidental to opposer's rendering of its
insurance brokerage services in Canada.  Not only are the
insurance policies or riders brokered by opposer that extend
certain coverages to the United States or U.S. citizens in
Canada merely part and parcel of opposer's rendering of its
services in Canada, but these policies and riders reflect
the rights and liabilities of the underwriter, not those of
the broker.  Such activities do not constitute rendering of
insurance brokerage services in either interstate or foreign
commerce.  Based on the facts of this case and the relevant
trademark law and precedent, we find that opposer has not
used its marks in connection with insurance brokerage
services rendered in commerce regulable by Congress.  It
would be antithetical to common sense to permit opposer, who

---

[18] We are not suggesting that failure to comply with state law would
necessarily negate trademark rights which were otherwise properly
established.

is not engaged in any brokerage services subject to U.S. state regulation, to rely upon the "use in commerce" provisions of the Trademark Act to establish priority over a New York state-licensed insurance brokerage business while itself avoiding the same state laws requiring, *inter alia*, licensure, name approval, and payment of taxes.  Opposer cannot have it both ways.

Opposer draws distinctions between interstate commerce and foreign commerce, and which particular "categories" of commerce pertain to its activities.  However, we need not address each of opposer's points in this regard.  We have looked at the facts of this case and found that none of opposer's incidental activities in evidence herein constitutes a brokerage service rendered in any type of commerce regulable by Congress.

Furthermore, the trademark cases cited by opposer in support of its position are distinguishable on their facts.[19]  For example, in the case of *Koffler Stores, Ltd. v. Shoppers Drug Mart, Inc.,* 434 F.Supp. 697, 193 USPQ 165 (E.D. Mich. 1976), plaintiff, a Canadian corporation, adopted its mark in Ontario, Canada in 1962 and was engaged in the retail drug business in Windsor, Ontario; obtained a

---

[19] Particularly in its reply brief, opposer cited a number of Supreme Court decisions addressing the Commerce Clause of the U.S. Constitution. These cases, however, do not support opposer's conclusion that opposer's activities in this case are rendered in "commerce."

Opposition Nos. 91122072, 91122224, 91122193, 91122450, 91122712, 91150237

Canadian trademark registration in 1969; obtained a U.S. trademark registration in February 1974; and opened a store in Florida in 1974, followed by other stores in the United States. Defendant's first use of the same mark did not occur until April or May, 1974, which was subsequent to the United States registration and use of Plaintiff's trademark. The court also concluded that defendant's adoption of the identical mark was not innocent, as plaintiff's advertising was extensive, circulated throughout the eastern portion of Michigan, as well as throughout other states adjacent to the Canadian-American border, and a significant amount of plaintiff's advertising originated in the United States. These facts of prior use and registration and extensive U.S. advertising differ significantly from the facts herein. Also, because of the very nature of insurance brokerage services, it is unlikely that a U.S. resident hearing advertising for opposer's services that spills over into, for example, New York state would leave either the state or the country to obtain insurance for property in, or another insurable risk whose nexus is, New York.

The plaintiff in the case of *Morningside Group Ltd. v. Morningside Capital Group L.L.C.,* 182 F.3d 133, 51 USPQ2d 1183 (2nd Cir. 1999), was a Hong Kong-based company with offices and licensees located in the United States, and engaged in various financial activities in the United States

33

through its offices and licensees. The issue reviewed by the Second Circuit was whether plaintiff provided a service and whether a mark had been used to identify a particular service, which the Second Circuit answered in the affirmative. The question before us is not whether opposer renders a service in connection with its marks, but whether such services are rendered in commerce.

Opposer cited the case of *International Bancorp, L.L.C. v. Societe des Bains de Met et du Cercie des Etrangers Monaco*, *supra*, for the principle that services rendered in a foreign country (in this case Monaco) to United States citizens were rendered in foreign commerce which satisfies the use in commerce requirement in the Trademark Act. However, the Court in *International Bancorp* stated (66 USPQ2d at 1713) that "the use of an unregistered mark in foreign trade does not in any way assure its owner that the mark will merit [Trademark] Act protection; it only makes such protection possible. For an unregistered mark that is used in foreign trade to merit [Trademark] Act protection, that mark must be distinctive among United States consumers." Thus, it was not insignificant to the Court that defendant had operated a casino in Monaco under the "Casino de Monte Carlo" trademark since 1863; that the casino is well known, if not famous worldwide; and that, for many years, defendant had maintained an office in New York

34

with a $1 million promotional budget. The Court stated (66 USPQ2d at 1717) that "where the mark is both used in advertising and displays in the United States and attached to services rendered in qualifying commerce overseas defendant has met the use in commerce requirement of the Trademark Act" and went on to state (66 USPQ2d at 1721 – 1722) the following:

> The proper inquiry in such circumstances is to evaluate first whether the commerce to which both parties claim their mark is attached may be regulated by Congress, and then to evaluate at what point in time the mark owners began to use or display the mark in the advertising and sale of *those* qualifying services *to the qualifying consumers*. … Indeed, that it is not enough for a mark owner to engage in qualifying commerce to create rights in his mark, and that it is not enough for a mark owner to use or display the mark in the advertising or sale of services to create rights in his mark, is critical." (*Emphasis in original.*)

When we apply the principles enunciated in *International Bancorp v. Monaco* to the facts in the case before us, we find, as previously stated, that the nexus of opposer's business is Canada; its activities in the United States are minimal and incidental to its Canadian business; its advertising is directed to Canadian purchasers; and there is only minimal spillover into New York of its advertising on a single local radio station. These facts are insufficient to reach the conclusion that services under the marks are rendered in foreign commerce.

Opposer also relies on *Larry Harmon Pictures Corp. v. The Williams Restaurant Corp.*, 929 F.2d 662, 18 USPQ2d 1292 (Fed. Cir. 1991), and *Penta Hotels, Ltd. v. Penta Tours*, 9 USPQ2d 1081 (D. Conn. 1988). However, these cases involved services that were actually rendered in the United States, *i.e.*, a restaurant located in Tennessee in the first case, and, in the second case, a hotel in New York that attracted interstate travelers and also engaged in extensive advertising and had a New York office that booked reservations. Similarly, the cases of *In re Gastown, Inc.*, 326 F.2d 780, 140 USPQ 216 (1964), and *In re Silenus Wines, Inc.*, 557 F.2d 806, 194 USPQ 26 (CCPA 1977), pertain to intrastate activities that were found to have a direct affect on, respectively, interstate commerce and foreign commerce, which is not the situation herein.

In conclusion, we find that opposer has not established use of its pleaded marks on insurance brokerage services rendered in a type of commerce regulable by Congress. Therefore, opposer cannot establish its priority and cannot prevail on its claim of likelihood of confusion.

*Decision*: The oppositions are each dismissed.